No. 22-35706

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

WESTERN WATERSHEDS PROJECT; KLAMATH-SISKIYOU WILDLANDS
CENTER; OREGON WILD; CENTRAL OREGON BITTERBRUSH BROADS OF
THE GREAT OLD BROADS FOR WILDERNESS; CONCERNED FRIENDS OF
THE WINEMA,

PLAINTIFFS-APPELLANTS,

v.

DOUGLAS C. MCKAY; BARRY L. IMLER; U.S. FOREST SERVICE; LAURIE
SADA; U.S. FISH AND WILDLIFE SERVICE,

DEFENDANTS-APPELLEES.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON, PORTLAND DIVISION
CASE NO. 1:19-CV-00516-MC

———————————

ANSWERING BRIEF OF DEFENDANTS-APPELLEES
———————————

**NATALIE K. WIGHT**
United States Attorney
District of Oregon
**KEVIN C. DANIELSON**
Executive Assistant United States Attorney
**SEAN E. MARTIN**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2936
Telephone: (503)727-1000

# TABLE OF CONTENTS

Table of Authorities ..................................................................... iv

Glossary of Acronyms and Abbreviations .............................................. viii

STATEMENT OF JURISDICTION .......................................................... 1

ISSUES PRESENTED FOR REVIEW ...................................................... 1

STATEMENT OF THE CASE .............................................................. 2

    I. The Antelope allotments area ...................................................... 2

    II. The Forest Service's review of grazing alternatives ....................... 3

    III. FWS's Biological Opinion ......................................................... 4

    IV. The Forest Services' Record of Decision adopting a new grazing framework ........................................................................ 6

    V. Proceedings in the district court .................................................. 9

SUMMARY OF ARGUMENT .............................................................. 10

STANDARD OF REVIEW ................................................................. 11

ARGUMENT .............................................................................. 13

    I.  The district court correctly concluded that the Forest Service complied with NEPA ................................................................. 13

        A. Legal background .................................................................. 13

        B. The district court rejected all of Plaintiffs' NEPA claims ........ 14

        C. Plaintiffs fail to establish that the Forest Service was arbitrary and capricious in its hard look at direct effects to frogs ............... 14

    1. The district court correctly rejected Plaintiffs' claim .......... 14

    2. Plaintiffs fail to show the agency was arbitrary and capricious in its assessment of direct effects to frogs. .............. 19

D. The district court correctly rejected Plaintiffs' hard-look claim regarding the effects of climate change on frogs. .......................... 24

    1. Plaintiffs' claim is forfeited.................................................. 25

    2. On the merits, Plaintiffs fail to establish the Forest Service's review was arbitrary and capricious ......................................... 26

E. Plaintiffs' brand-new Jack Creek population NEPA claim is no grounds to reverse the district court. ........................................... 32

II. The district court correctly concluded that the Forest Service complied with NFMA......................................................................... 37

A. Legal background ................................................................... 37

B. The district court rejected all of Plaintiffs' NFMA claims....... 38

C. Plaintiffs fail to establish that the Forest Service was arbitrary and capricious.................................................................................... 38

    1. The district court correctly rejected Plaintiffs' claims regarding soil provisions ........................................................... 38

    2. The district court correctly rejected Plaintiffs' claims regarding riparian provisions.................................................... 44

    3. Plaintiffs' trespass/noncompliance arguments show no grounds to reverse the district court. ....................................... 47

        a. The Forest Service under NFMA rationally authorized the new framework in light of unauthorized grazing............... 47

      b.  Plaintiffs fail to show the Forest Service was arbitrary and capricious .......................................................................... 49

III.  The district court correctly concluded that FWS complied with the ESA. ............................................................................ 55

   A.  Legal background .................................................... 55

   B.  The district court rejected Plaintiffs' ESA claims.................... 56

   C.  Plaintiffs fail to establish that FWS was arbitrary and capricious ........................................................................ 57

     1.  The district court correctly rejected Plaintiffs' climate-change claim against the Biological Opinion ........................... 57

       a.  The Biological Opinion was neither arbitrary nor capricious................................................................. 57

       b.  Plaintiffs' arguments fail to show the Biological Opinion was arbitrary and capricious ................................................ 62

     2.  Plaintiffs fail to establish the Biological Opinion's reliance on certain mitigation measures was arbitrary and capricious. 67

       a.  FWS was neither arbitrary nor capricious ...................... 67

       b.  Plaintiffs' arguments fail to establish the Biological Opinion was arbitrary and capricious ................................. 71

CONCLUSION ......................................................................... 75

CERTIFICATE OF COMPLIANCE........................................... 76

STATEMENT OF RELATED CASES ...................................... 76

# TABLE OF AUTHORITIES

## CASES

*Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791 (Fed. Cir. 1993) ............. 70

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ........................................... 33

*Appalachian Voices v. U.S. Dep't of Interior*,
    25 F.4th 259 (4th Cir. 2022) ...................................... 63, 64

*Ass'n of Public Agency Customers, Inc. v. Bonneville Power Admin.*,
    126 F.3d 1158 (9th Cir. 1997) ........................................ 33

*Atel Financial Corp. v. Quaker Coal Co.*,
    321 F.3d 924 (9th Cir. 2003) .................................... 11, 26

*California v. Block*, 690 F.2d 753 (9th Cir. 1982) ................................ 13

*Camp v. Pitts*, 411 U.S. 138 (1973) ..................................... 54

*Churchill Cnty. v. Norton*, 276 F.3d 1060 (9th Cir. 2001) ............. 15, 18

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*,
    417 F. Supp. 3d 1354 (W.D. Wash. 2019) ........................ 24

*Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1-14-cv-737-
CL, 2014 WL 2611344 (D. Or. June 11, 2014) ......................... 30-31, 55

*Concerned Friends of the Winema v. U.S. Forest Serv.*,
    No. 1-14-cv-00737-CL, 2018 WL 7254704 (D. Or. Dec. 10, 2018) .... 52

*Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-cv-737-
CL, 2016 WL 10637010 (D. Or. Sept. 12, 2016) ........................ 50, 51, 72

*Ctr. for Biological Diversity v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) .................................... 68, 71

*Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir. 2018) ... 63

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) ........................... 25

*Dickinson v. Zurko*, 527 U.S. 150 (1999) .............................................. 12

*Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125
   (9th Cir. 2010) .................................................................................. 12

*Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992) ......... 61-62

*In re Big Thorne Project*, 857 F.3d 968 (9th Cir. 2017) .................. 37, 39

*Jachetta v. U.S.*, 653 F.3d 898 (9th Cir. 2011) ..................................... 22

*Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006) ....... 12

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc) . 39, 53

*Lindberg v. U.S. Forest Serv.* 132 F. Supp. 3d 1255 (D. Or. 2015) ....... 25

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989) ..................... 29

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147
   (9th Cir. 2008) .................................................................................. 25

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067
   (9th Cir. 2011) .................................................................................. 31

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861
   (D. Or. 2016) ............................................................................... 62, 74

*Native Ecosystems Council v. Weldon*, 697 F.3d. 1043
   (9th Cir. 2012) ............................................................................ 13, 35

*Native Vill. of Point Hope v. Jewell*, 740 F.3d 489 (9th Cir. 2014) ....... 24

*Novato Fire Prot. Dist. v. United States*, 181 F.3d 1135
    (9th Cir. 1999) ............................................................... 22, 33

*Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv.*,
    475 F.3d 1136 (9th Cir. 2007) ........................................ 23

*Save Our Cabinets v. U.S. Fish & Wildlife Serv.*, 255 F. Supp. 3d 1035
    (D. Mont. 2017) ............................................................... 74

*Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) ......... 26, 31

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024
    (9th Cir. 2020) ........................................................ *passim*

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ..... 13

*San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Defense*,
    817 F.3d 653 (9th Cir. 2016) ........................................... 15

*San Luis & Delta-Mendoza Water Auth. v. Jewell*, 747 F.3d 581
    (9th Cir. 2014) .................................................... 4-5, 20, 56

*San Luis & Delta–Mendota Water Auth. v. Locke*, 776 F.3d 971
    (9th Cir. 2014) ......................................................... 60, 61

*Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025 & n.5
    (9th Cir. 2012) ............................................................. 17

*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988) ........ 21, 22

*Sierra Club v BLM*, 786 F.3d 1219 (9th Cir. 2015) ............................. 23

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    878 F.3d 725 (9th Cir. 2017) ........................................... 60

*W. Watersheds Project v. U.S. Forest Serv.*, 780 F. Supp. 2d 1115
    (D. Idaho 2011) ............................................................ 41

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010) ........ 35

# STATUTES

5 U.S.C. § 706 ...................................................................... 12

16 U.S.C. § 1536 ................................................ 5, 55, 56, 61

16 U.S.C. § 1604 .................................................................. 37

28 U.S.C. § 1291 .................................................................... 1

28 U.S.C. § 1331 .................................................................... 1

42 U.S.C. § 4332 .................................................................... 3

# RULES

Fed. R. App. P. 4 .................................................................... 1

# REGULATIONS

36 C.F.R. § 218 ............................................................. 4, 25-26

40 C.F.R. § 1500.4 ............................................................... 15

40 C.F.R. § 1501.12 ............................................................. 15

50 C.F.R. § 402.02 ............................................................... 57

50 C.F.R. § 402.14 ............................................................... 57

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| AMP | Allotment Management Plan |
| APA | Administrative Procedure Act |
| AUM | Animal Unit Month (defined at 1-SER-150) |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| ER | Plaintiffs' Excerpts of Record |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FWS | U.S. Fish and Wildlife Service |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| ROD | Record of Decision |
| SER | Defendants' Supplemental Excerpts of Record |

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.  The district court granted Defendants' cross-motion for summary judgment, 1-ER-0003-31, and final judgment was entered on July 5, 2022.  1-ER-0002.  Plaintiffs filed a timely notice of appeal on September 2, 2022.  5-ER-1167-68.  Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

Plaintiffs brought claims under the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Endangered Species Act ("ESA").  Plaintiffs alleged that the U.S. Forest Service and U.S. Fish & Wildlife Service ("FWS") were arbitrary and capricious in deciding to revise the management of long-standing livestock grazing and in recognizing that the revision was not likely to jeopardize any ESA-protected species, respectively.

The issues on appeal are:

1. Whether the district court correctly rejected Plaintiffs' NEPA claims?

2. Whether the district court correctly rejected Plaintiffs' NFMA claims?

3. Whether the district court correctly rejected Plaintiffs' ESA claims?

## STATEMENT OF THE CASE

## I.     The Antelope allotments area

The area known as the Antelope allotments encompasses more than 168,500 acres of livestock rangelands in south-central Oregon.  2-ER-0054.  This includes more than 137,00 acres in Lake and Klamath Counties managed by the Fremont-Winema National Forest and more than 31,000 acres under other ownership.  *Id*.; 2-ER-0056.  This area was grazed beginning in the 1870s by cattle owned by Oregon homesteading families, and the public lands came under Forest Service control in the early 20th century.  4-ER-0725, 2-ER-0056.

Within the allotments, the Oregon spotted frog (the "frog") was discovered in public and private lands in the Jack Creek area in 1996.  3-ER-0399.  In August 2014, FWS listed the frog as "threatened" under the ESA.  1-ER-0004, 3-ER-0389.  Part of the Antelope rangelands also include groundwater-dependent ecosystems, including the largest concentration of fen habitats (a type of wetland with a surface or near-

surface water table) within this Forest Service region. 2-ER-0136; 1-SER-150 (defining "fen"). Fen habitats support a variety of sensitive plant and mollusk species. *Id.*

## II.    The Forest Service's review of grazing alternatives

The Forest Service began a NEPA process in 2010 to consider revisions to its existing grazing framework on the Antelope allotments, and issued a Draft Environmental Impact Statement ("DEIS") in December 2014. 2-ER-0058-59. NEPA requires agencies to disclose the environmental impact of any proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

In November 2017, the Forest Service published a Final Environmental Impact Statement ("FEIS") that analyzed five alternatives for grazing. 2-ER-0033-0327. The FEIS identified and analyzed several "key issues," including grazing in riparian areas. *See* 2-ER-0060. The FEIS also confronted the "key issue" of grazing in frog habitat. *See* 2-ER-0060-61.

The FEIS was informed by a series of reports from agency experts that addressed the effects of the alternatives on various resources. The

reports addressed soils (3-ER-0566-0607); vegetation and range resources (4-ER-0723-95); hydrology (3-ER-0512-65); botany (4-ER-0622-89, 1-SER-94-129); and wildlife (4-ER-0690-722).

Accompanying the FEIS, the Forest Service also published a proposed monitoring plan and adaptive management strategy for grazing. 1-SER-153-58. With the FEIS, the agency also published its response to public comments on the DEIS. *See* 1-SER-159-174. Along with the FEIS, the Forest Service supplied a draft (unsigned) Record of Decision. 1-SER-175-88. The agency advised that members of the public could file objections under 36 C.F.R. § 218. 1-SER-187-88.

In January 2018, Plaintiffs lodged detailed objections under this formal administrative process. 1-ER-0005; 2-SER-312-99. This objection process was separate from the earlier opportunity provided to comment on the DEIS. In March 2018, the Forest Service responded to the objections. 2-SER-400-47.

## III.  FWS's Biological Opinion

Because the Forest Service determined that its proposed new grazing framework was "likely to adversely affect" the frog, it engaged in formal ESA consultation with FWS. *See San Luis & Delta-Mendoza*

*Water Auth. v. Jewell*, 747 F.3d 581, 596 (9th Cir. 2014).

At the conclusion of this ESA process, FWS was required to provide the Forest Service a Biological Opinion as to whether the proposed Forest Service action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 16 U.S.C. § 1536(b)(3)(A).

On May 21, 2018, accordingly, FWS completed a Biological Opinion addressing the effects of the proposed new grazing framework on the frog and its critical habitat. 3-ER-0370-451. FWS concluded that the proposed framework was unlikely to jeopardize the continued existence of the species. 3-ER-0429. FWS also concluded the proposed framework was not likely to adversely affect the frog's critical habitat. 3-ER-0430.

As FWS emphasized, the frog has recently been detected in new nearby locations at Jack Creek. 3-ER-0399-400. According to FWS, the new detections are "significant" because they "have led to an increase in the amount of known occupied habitat in Jack Creek, bolstered the known baseline population abundance in Jack Creek, and demonstrated that the Jack Creek frogs are able to persist in remnant pool habitat

during intermittent conditions." 3-ER-0400. Accordingly, FWS found that the Jack Creek frog population is "relatively stable, with some potential for an upward population trend." *Id*. As the district court found, "recent data indicates a modest recovery." 1-ER-0004.

The Biological Opinion noted that the frogs are mobile during most life stages and "expected to flee out of harm's way when cattle are present, but that a very small percentage may be trampled by cattle." 3-ER-0415. The Biological Opinion also noted scientific findings that an intermediate level of cattle grazing-related disturbance may benefit the frog's habitat. 3-ER-0410.

## IV. The Forest Service's Record of Decision adopting a new grazing framework

On May 25, 2018, the Forest Service issued a Record of Decision ("ROD") adopting the new grazing framework. 3-ER-0350-69, 2-SER-448-64. The Forest Service adopted a new framework with elements of both Alternatives 3 and 5 from the FEIS. 3-ER-0351, 0356. Both of these alternatives would add the North Sheep Pasture to the allotments to better distribute cattle and utilization, use a deferred-rotation grazing system, bring private grazing lands along Jack Creek under Forest Service management, upgrade off-creek water sources for cattle,

and construct/reconstruct fences.  2-ER-0079-80, 0090-91.

For the new framework, the ROD provided that "strict adherence" was required to the monitoring and adaptive management plan.  3-ER-0360-61.  This plan includes specific measures to protect frogs from cattle in low-water conditions.  *See* 1-SER-153-58.  The ROD explained why the Forest Service believed the new framework would appropriately conserve the frog and maintain fens and related sensitive species.  3-ER-0359-64.

Under the ROD, the new framework expands the grazing base by more than 21,000 acres, including a significant expansion of available riparian areas, which is expected to improve livestock distribution and reduce areas of concentrated use.  3-ER-0356, 0358, 0363.  The ROD mandates that cattle be removed once specific utilization limits are met, even if before the expected grazing duration.  3-ER-0353.

The ROD expanded the grazing acreage base but kept nearly steady the overall forage utilization limit.  The prior system capped total forage use at 3,289 Animal Unit Months ("AUMs") and the new framework caps AUMs at 3,400.  3-ER-0105, 3-ER-0114, 2-SER-450.  *See also* 1-SER-150 (defining AUM).

The ROD also authorized taking the private lands at Jack Creek under Forest Service management. 3-ER-0359. The agency believes this is critical to frog conservation because these private lands contain "a majority of the existing occupied habitat" for the frog within the perennial Jack Creek reach, and the private landowner has grazed these lands at a very heavy utilization level. 2-ER-0061, 1-ER-0012. This aspect of the ROD allows more protective terms and conditions to be applied across all portions of the frog's habitat in the Jack Creek system. 3-ER-0359.

In addition to these elements, the ROD defines and limits grazing in a variety of pastures and incorporates the new practice of periodic rest between pastures or portions of pastures. *See* 2-SER-447. There are four Jack Creek pastures authorized for up to three months of grazing each year. 3-ER-0364. But no grazing may occur on two of these pastures until headcut repair and other restoration has occurred, including the installation of a new off-creek water source. 3-ER-0257, 2-SER-259, 451-52. The ROD also directs implementation of a variety of fence improvements and upgraded off-creek cattle water sources. 2-SER-454-57.

The issuance of an Allotment Management Plan ("AMP") and new permits are part of the ROD's implementation of the new framework. 3-ER-0369. On May 31, 2018, accordingly, the Forest Service issued a new AMP and grazing permits. 3-ER-0329-49, 2-SER-465-82.

## V.  Proceedings in the district court

In April 2019, Plaintiffs filed this action. 5-ER-1160. In July 2019, the district court denied Plaintiffs' motion for a preliminary injunction. 5-ER-1163. In August 2019, Defendants filed the agencies' administrative records. *Id*.

The parties briefed cross-motions for summary judgment. 5-ER-1163-64. After oral argument, the district court allowed supplemental briefing and held a second oral argument. 5-ER-1165. On July 5, 2022, the district court granted summary judgment to Defendants. 1-ER-0002-31.

Many of the district court's findings and conclusions are not challenged in the instant appeal. Illustratively, the district court's conclusion is unchallenged that the Forest Service under NEPA rationally predicted that the new grazing framework would result in "better dispersal" of cattle, "and therefore decreased impacts" as

compared to the status quo. 1-ER-0008-10. The district court's rejection of Plaintiffs' NEPA claim directed at the Forest Service's monitoring and adaptive management plan is also unchallenged. 1-ER-0010-12.

## SUMMARY OF ARGUMENT

As the district court found, the Forest Service reached a well-supported decision to establish a new framework for livestock grazing on the Antelope allotments. The agency's May 2018 decision was the culmination of years of public process and expert analysis by the agency's resource specialists and the result of formal ESA consultation with FWS. The decision includes specific and mandatory protections to conserve the frog and maintain other key resources. The new framework, the Forest Service rationally predicts, will maintain or improve resource conditions from the status quo.

The Forest Service met its procedural requirements under NEPA because it considered adequate information about the environmental effects of the proposed grazing alternatives and made relevant information available to the public before reaching its decision. The agency also rationally explained the basis for its decision and met the

substantive requirements of NFMA.

In its May 2018 Biological Opinion, FWS appropriately assessed the best available science and explained the basis for its expert ESA findings that the new grazing framework would not jeopardize the continued existence of the frog and would not adversely affect the frog's critical habitat.

Plaintiffs have their own preferences on how the public lands should be managed. But they fail to show that the Forest Service and FWS were arbitrary and capricious in their May 2018 decisions.

## STANDARD OF REVIEW

This Court reviews the district court's decision on cross-motions for summary judgment *de novo*. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.* ("*ONDA*"), 957 F.3d 1024, 1032 (9th Cir. 2020). This Court may affirm the district court on any grounds supported by the record, whether or not the district court relied on the same grounds. *See Atel Financial Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003).

Judicial review of NEPA, NFMA, and ESA claims is governed by the Administrative Procedure Act ("APA"), which allows agency action to be set aside only if "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." *See ONDA*, 957 F.3d at 1032 (internal quotation omitted); 5 U.S.C. § 706(2)(A). This APA standard is "highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006).

An agency decision is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency's decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *ONDA*, 957 F.3d at 1033 (internal quotation omitted).

Agency factual conclusions are reviewed for "substantial evidence," a standard more deferential than the "clearly erroneous" standard for appellate review of trial court findings. *Dickinson v. Zurko*, 527 U.S. 150, 162, 164 (1999); *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1133-34 (9th Cir. 2010).

# ARGUMENT

## I. The district court correctly concluded that the Forest Service complied with NEPA.

### A. Legal background

The purpose of NEPA is twofold: (1) to ensure that federal agencies carefully consider information about significant environmental impacts, and; (2) to guarantee relevant information is available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA does not require agencies to choose the environmentally preferable alternative. *See id.* at 350. "NEPA merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351. NEPA neither compels particular results nor imposes substantive environmental obligations upon federal agencies. *Id.* at 350-351.

"A court generally must be at its most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Native Ecosystems Council v. Weldon*, 697 F.3d. 1043, 1051 (9th Cir. 2012) (internal quotation omitted). Once a court is "satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences," judicial review under NEPA "is at an end." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).

**B. The district court rejected all of Plaintiffs' NEPA claims.**

The district court rejected all of Plaintiffs' myriad NEPA challenges, most of which are not at issue in this appeal. See 1-ER-0008-12, 0018-22. Plaintiffs argue that the district court erred only in rejecting their claim that the Forest Service failed to take a hard look at direct impacts to frogs, 1-ER-0020-22, and in rejecting their claim that the agency failed to take a hard look at how climate change will interact with grazing's effects and that the agency relied on stale data. 1-ER-0019-20.

**C. Plaintiffs fail to establish that the Forest Service was arbitrary and capricious in its hard look at direct effects to frogs.**

**1. The district court correctly rejected Plaintiffs' claim.**

Plaintiffs argue that the Forest Service violated the APA because the FEIS under NEPA "did not examine" direct impacts to individual frogs and wrongly "focus[ed] on impacts to habitat." Br. 25-28. They are wrong.

As the district court recognized, the Forest Service provided a reasonable disclosure of potential direct effects to individual frogs. 1-ER-0020-22. When evaluating a NEPA sufficiency challenge, the court

makes a "pragmatic judgment" whether an EIS's form, content, and preparation fosters "informed decision-making and informed public participation." *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001) (internal quotation omitted)). In the FEIS, the agency discussed potential direct effects, including trampling of frogs by cattle, in reviewing the NEPA alternatives. 2-ER-0200-10. The FEIS acknowledged "adverse effects" to frogs from Alternatives 3 and 5, including from trampling and from cattle bedding down in specific areas, that are "Likely to Adversely Affect" the frog and its habitat. 2-ER-0210.

The FEIS informed the public that "[a]dditional detail" on effects to frogs was available in the Biological Assessment, and incorporated that document into its effects review. 2-ER-0208, 5-ER-0923-51, 1-SER-189-227. NEPA regulations direct agencies to incorporate such documents into NEPA reviews. *See* 40 C.F.R. §§ 1500.4(l), 1501.12. *See also*, *e.g.*, *San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Defense*, 817 F.3d 653, 661 (9th Cir. 2016) (rejecting a NEPA challenge when agency identified and incorporated by reference documents supporting its analysis).

The Biological Assessment shows a hard look at the potential direct effects of grazing on the frog. It noted that livestock "can cause direct mortality" by frog trampling "when livestock are allowed in shallow water habitat when frogs are present." 5-ER-0924. Trampling and introduction of parasites or pathogens from grazing has "negative impacts" on the frog. 5-ER-0934. Similarly, cattle herding can kill individual frogs, and large numbers of cattle bedding down in the riparian system can kill individual frogs. 5-ER-0935, 0936. The Biological Assessment also found that drought creates limited water situations and likely harms frogs. 5-ER-0933.

Further showing a hard look at the direct effects to frogs, the FEIS incorporated by reference two additional scientific evaluations. 2-ER-0200, 0208 (incorporating the evaluations); 1-ER-0021-22 (district court's discussion of these evaluations). One evaluation, *A Conservation Assessment for the Oregon Spotted Frog*, found that grazing can have direct negative effects on frogs (trampling) and that drought is a potential threat. 3-SER-488, 503-04, 506. It also found that "[a]daptive management of grazing" has potential to maintain desired habitat conditions. 3-SER-511. The other evaluation, the *Jack Creek OSF Site*

*Management Plan*, 4-ER-0879-920, found that grazing may negatively directly affect frogs (although data are sparse), that climate change that reduces seasonal water in the Jack Creek system is one of the greatest threats to the frog, and that grazing at Jack Creek may be a helpful tool in achieving frog habitat goals if cattle are properly managed. 4-ER-0895, 0897, 0905, 0916-20.

Confirming the agency's hard look, the Forest Service also discussed trampling and other effects in its response to comments. Courts consider responses to comments "for confirmation that an agency has taken a 'hard look' at an issue under NEPA." *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1037 & n.5 (9th Cir. 2012). In response to Plaintiffs' comments about trampling, the Forest Service noted that trampling is a threat, that certain grazing systems can decrease exposure to trampling, and that the proposed grazing framework may impact individual frogs. 1-SER-166. *See also* 1-SER-168, 169, 170.

The FEIS also fostered informed decision-making and informed public participation under NEPA, because it told the public that further information on frog threats from grazing "is available" in the Wildlife

report in the project record. 2-ER-0202. Similarly, the Forest Service's response to comments noted that effects to the frog were discussed "extensively" in the Wildlife report, and that the report identified "threats" to frogs. 1-SER-161, 171; 4-ER-0690-722 (Wildlife report).

The agency's reference to the Wildlife report in the NEPA process informed Plaintiffs' participation, because their January 2018 administrative objections referenced the report repeatedly. 2-SER-369, 334, 316. The Wildlife report disclosed the risks to the frog from livestock use, including trampling. 4-ER-0694. It also discussed negative effects to the frog from changes in water levels due to drought or climate change, and that particular stressors "may become more acute risks in dry years." 4-ER-0696. In a "matrix of threats," the report also discussed direct trampling of frogs and the effects of low water from drought. 4-ER-0707-09.

Under NEPA, the Forest Service's process fostered informed decision-making and informed public participation. *See Churchill Cnty.*, 276 F.3d at 1071. The agency took the requisite hard look at direct effects to individual frogs.

## 2. Plaintiffs fail to show the agency was arbitrary and capricious in its assessment of direct effects to frogs.

Plaintiffs argue that frogs are especially vulnerable to the effects of low water late in the grazing season, Br. 25, but the *Jack Creek OSF Site Management Plan* emphasized that very point. 4-ER-0897. And as the district court found, the FEIS addressed cattle-frog conflicts in limited-water situations. 1-ER-0020; 2-ER-0203. Further, the Biological Assessment emphasized that low water conditions are a threat to the frog, as did *A Conservation Assessment for the Oregon Spotted Frog*. 1-SER-191; 5-ER-0933, 3-SER-506. In addition, the FEIS was accompanied by the Forest Service's plan detailing specific protections for low-water conditions. 1-SER-153-58. As the district court noted, this plan "responded to concerns about the impacts" to the frog. 1-ER-0022.

Further, while the FEIS accounted for the potential trampling of frogs as explained above, NEPA did not require the Forest Service to speculate as to the scale of effects. As the *Jack Creek OSF Site Management Plan* cautioned, "the magnitude of" the trampling threat is "unknown." *See* 4-ER-0895. Similarly, *A Conservation Assessment for the Oregon Spotted Frog* noted that further information is needed to

better understand this potential threat.  2-SER-503-04.  At the time of the FEIS, more definitive information on the specific trampling effects of particular grazing alternatives was not known.  *See* 3-ER-0415 (FWS's statement in May 2018 Biological Opinion that to its knowledge, "trampling of Oregon spotted frogs has not been documented").

The Forest Service discussed the potential threat of trampling and that the frog would be adversely affected by grazing, but NEPA did not require agency speculation beyond what the record could support, and Plaintiffs were able to voice their views.  Further, the Forest Service accounted for non-lethal forms of direct harm because it accounted for threats to the frog including cattle bedding down in riparian areas and exposure to pathogens from cattle.  5-ER-0924, 0925, 0934, 0936; 4-ER-0694.

To try to establish a violation, Plaintiff cite the district court's discussion of a claim in an earlier lawsuit, Br. 26, but that was an ESA claim, not a NEPA claim.  The ESA and NEPA "involve different processes that measure different kinds of environmental impacts."  *San-Luis & Delta-Mendota Water Authority v Jewell*, 747 F.3d 581, 651 n.15 (9th Cir. 2014). Moreover, that earlier ESA decision faulted the agency

for omitting certain forms of harm to frogs from its analysis; here, as discussed, the agency *did* consider the kind of harm that Plaintiffs argue is missing.

Plaintiffs argue that because a final Biological Assessment was not issued until after the FEIS, the Biological Assessment incorporated by the FEIS could not "fulfill" the agency's NEPA duty to disclose impacts to frogs. Br. 26 n.7. But the FEIS incorporated the signed (September 18, 2017) Biological Assessment (2-ER-0208, 5-ER-923), and the Biological Assessment was finalized in December 2017, more than six months before the Forest Service issued its final ROD in May 2018. 2-SER-229-311. Further, the final Biological Assessment was available to Plaintiffs during the NEPA process—they referenced it repeatedly in their January 2018 administrative objections. 2-SER-321, 325, 327. The record shows that Plaintiffs had the Biological Assessment and were able to voice informed views in the NEPA process. The Forest Service undertook a hard look at direct effects to frogs and fostered Plaintiffs' ability to engage the agency with their concerns.

Plaintiffs rely on *Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988), Br. 26 n.7, to argue that the Forest Service erred in

referencing the Biological Assessment in the FEIS, but that case is far afield. There, an agency could not rely on a Biological Assessment to cure defects in its NEPA analysis, when the agency awarded road-reconstruction contracts before it prepared the NEPA analysis, and construction began before it prepared the Biological Assessment. *Id.* at 718. There, the agency's entire wildlife discussion was "five brief sentences." 840 F.2d at 718. Here, in contrast, the Forest Service extensively assessed potential direct effects to frogs. Further, the Biological Assessment here was finalized more than six months before the Forest Service completed its NEPA process. 2-SER-229-311.

For the first time on appeal, Plaintiffs argue that an initial internal draft of the FEIS shows the Forest Service was arbitrary and capricious, because that draft had a table with details on the effects of each grazing alternative, and the finalized FEIS deleted these details. Br. 27 (citing administrative record documents at 5-ER-0972-73). This argument is forfeited. *Jachetta v. U.S.*, 653 F.3d 898, 912 (9th Cir. 2011); *Novato Fire Prot. Dist. v. United States*, 181 F.3d 1135, 1141 n.6 (9th Cir. 1999) (concluding that a party's failure to raise certain issues in summary judgment "waives their right to do so on appeal").

Plaintiffs never raised this argument in the district court, 1-SER-2-86, even though they had the administrative record months before filing their summary judgment briefs. *See* 5-ER-1163-65.

Even if this Court were to reach this new argument, the internal draft table does not establish any violation. Plaintiffs complain that the agency removed the table without explanation, but no explanation was required. *See Sierra Club v BLM*, 786 F.3d 1219, 1226 (9th Cir. 2015) (noting that an "evolving analysis" by an agency during an administrative process was unofficial policy, not a change that required explanation or justification). Further, the March 2017 draft table did not articulate any scientific or factual rationale for its effects ratings, and the draft is not consistent with the discussions in the subsequent Biological Assessment and subsequent Wildlife report. The draft is also irrelevant under the APA, because what is at issue is the Forest Service's final grazing decision—the May 2018 ROD—and the "only question" is whether the agency in reaching that decision "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1145 (9th Cir. 2007).

Plaintiffs cite *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 417 F. Supp. 3d 1354 (W.D. Wash. 2019) to support their argument that the agency arbitrarily omitted the table from the FEIS, but there litigants preserved the relevant issue in the district court, and the court determined that the agency made a faulty determination of "minimal" effects given the documents in the administrative record. *Id.* at 1360-61. Here, Plaintiffs never raised the issue to the district court, and the Forest Service told the public that the new framework was likely to adversely affect the frog; the Forest Service did not irrationally minimize its effects finding. Plaintiffs also cite *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489 (9th Cir. 2014), but there an agency published an EIS with a central estimate that was unsupported. *Id.* at 501-502. Here, the Forest Service was upfront in the FEIS that Alternatives 3 and 5 would adversely affect the frog and it supported its findings with expert analysis.

### D. The district court correctly rejected Plaintiffs' hard-look claim regarding the effects of climate change on frogs.

The district court correctly rejected Plaintiffs' hard-look claim regarding the effects of climate change, drought, and grazing on the frog. 1-ER-0019-20.

## 1. Plaintiffs' claim is forfeited.

First, Plaintiffs' claim is forfeited because the detailed objections they submitted under the Forest Service's predecisional administrative review regulations, 36 C.F.R. § 218, never raised this issue. 2-SER-312-99. When a particular issue is not presented to an agency during the appropriate NEPA comment period, the issue is forfeited. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004). *See id.* at 764-65 (holding that because NEPA litigants "did not raise these particular objections" to the agency, the agency "was not given the opportunity to examine" the objections, and the litigants "forfeited" the objections). *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008) (finding forfeiture in NEPA context and citing *Pub. Citizen*). Here, Plaintiffs prepared detailed objections but failed to alert the local Forest Service officials to any contentions regarding climate change. *See Lindberg v. U.S. Forest Serv.* 132 F. Supp. 3d 1255, 1268 (D. Or. 2015) (citing section 218 and finding a NEPA issue forfeited when it was not raised in objections). Similarly, Plaintiffs' claim that the Forest Service relied on stale data in assessing climate change-related effects is also forfeited, as that distinct issue is nowhere raised

in their extensive objections under 36 C.F.R. § 218.  2-SER-312-99.

This Court should affirm the district court on this alternate ground.

*See Atel Financial Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir.

2003;  *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 571-74 (9th Cir.

2016).

### 2. On the merits, Plaintiffs fail to establish the Forest Service's review was arbitrary and capricious.

Aside from forfeiture, the district court correctly rejected

Plaintiffs' claim.  The Forest Service rationally accounted for drought

exacerbating pressure on frogs in combination with grazing.  As the

FEIS emphasized, in light of climate change, local drought can cause

loss of habitat or degradation of vegetation.  2-ER-0202 (noting "the

magnitude of stressors to [frogs] are expected to increase as they

interact with water supply").  Accordingly, to mitigate the threats posed

by low-water conditions in the grazing context, the FEIS disclosed a

specific plan to protect the frog.  1-SER-154-58; *see also* 2-SER-256

(emphasizing that the plan was established "to minimize the potential

increase in stressors to Oregon spotted frog").

Plaintiffs argue that the FEIS effects analysis "failed to even

mention drought or climate change."  Br. 28.  This is wrong.  The frog-

effects analysis expressly incorporated the *Jack Creek OSF Site Management Plan* and the Biological Assessment. 2-ER-0200, 0203, 0208. Both of these documents discussed drought and climate change, specific to the project area, and assessed effects to the frog in the context of grazing.

The *Jack Creek OSF Site Management Plan* recognized that one of the "greatest threats to the hydrological regime of Jack Creek" is "likely climate change," in the context of lowered seasonal water levels. 4-ER-0897. It noted that how much a prior drought influenced a frog decline is 'unclear," but that Jack Creek hydrological regimes "may be affected by grazing, particularly in drought years" and that cattle-frog conflicts "become more likely under conditions of limited stream flow." *Id.; See also* 4-ER-0891, 0894, 0895 (further discussion of the risks and effects of local drought).

Plaintiffs rely on statements in the *Jack Creek OSF Site Management Plan* to show a supposed failure in the FEIS, Br. 29, but the Plan was itself part of the FEIS's effects analysis. And Plaintiffs' suggestion now that the Forest Service needed to do more to incorporate the Plan's analysis is directly contrary to what Plaintiffs told the agency

during the NEPA process—that it "must not rely" on the Plan and that Plaintiffs "object to the use" of the Plan in NEPA review. 2-SER-316, 322, 357.

Plaintiffs are also wrong that the Forest Service failed to take hard look at the effects of climate change and drought, because the Biological Assessment identified low water from drought as "probably the most severe threat" to the Jack Creek frog population. 1-SER-191, 2-SER-256. It noted that low-water years can severely reduce connectivity between habitats necessary to support all frog life stages, and predicted that in low water years, the impacts from other stressors such as grazing are exacerbated. *Id*. The Biological Assessment identified drought as a factor likely to adversely affect the frog. 5-ER-0933.

Plaintiffs note that there is risk to frogs in intermittent sections of Jack Creek, Br. 29-30, but the FEIS addressed that risk by disclosing a low-water strategy to mitigate the risk in those sections. 1-SER-153-58. Plaintiffs cite a statement in an unsigned 2016 litigation declaration from their expert Simpson alleging that use of intermittent pools by cattle has "caused significant harm" to the frog, Br. 29 (citing 4-ER-

0864), but that statement did not discuss whether the FEIS adequately addressed the issue, did not specifically mention drought or climate change, and did not address the low-water strategy. Plaintiffs also rely on Simpson's 2014 litigation declaration, Br. 29-30 (citing 4-ER-828-30), but that declaration also did not address the FEIS or the low-water strategy. To the extent that Plaintiffs would rely on their litigation declarant Cummings' representations about drought in the region, Br. 7 (citing 5-ER-1053), Cummings did not discuss how those representations interacted with grazing or the frog. Even more fundamentally, the Forest Service had the discretion to rely on the reasonable opinions of its own qualified experts rather than Simpson or Cummings. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

Nor did the Forest Service rely on stale data, as the district court correctly found. 1-ER-0020. The FEIS not only looked to temperature trends from 2000-10, 2-ER-307, but also considered future expected trends. Its analysis noted that future average temperatures in the area are expected to increase, accompanied by reduced snowpack and snowmelt and peak flows earlier in the year. 2-ER-0309. The FEIS

also noted that in light of climate change, local drought can cause loss of habitat or degradation of vegetation, that the Klamath Basin water supply is expected to become more variable, and that the magnitude of stressors to the frog "are expected to increase as they interact with water supply." 2-ER-0202. At the same time, the FEIS appropriately found that "a great deal of uncertainty still remains when analyzing effects of climate change." 2-ER-0308.

Plaintiffs complain that the *Jack Creek OSF Site Management Plan* described "more serious drought conditions" than those in the FEIS, Br. 29 (citing 4-ER-0897). But as discussed above, the FEIS discussed and incorporated the Plan into is discussion of effects. 2-ER-203. Plaintiffs also reference a district court ruling in prior litigation, Br. 29, but the cited page in that ruling simply mentioned "increasing drought conditions" in 2014. More importantly, Plaintiffs fail to mention the district court's 2014 conclusions that the "effects of drought or grazing on fens are unknown," that "there are many possible reasons for the decline" of the frog beyond grazing, and that "moderate grazing might improve frog habitat by thinning dense vegetation on stream

banks." *Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1-14-cv-737-CL, 2014 WL 2611344, *5 (D. Or. June 11, 2014).

Plaintiffs rely on *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011), Br. 30, which faulted an agency's NEPA analysis for relying on stale data. But there the agency did not have on-the-ground surveys of species and relied on old aerial surveys. *Id.* at 1085-86. Here, the Forest Service has detailed, up-to-date knowledge of frogs and frog habitat at Jack Creek, and accounted for past and expected drought with a specific low-water plan to minimize effects to frogs. The FEIS did not discount the risks that drought can bring during grazing.

Plaintiffs also cite *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016), Br. 29, for the proposition that inaccurate information in a NEPA analysis may impede the statute's objectives, but that decision addressed an agency's erroneous disclosure of where a species was located that undermined subsequent review. Here, the Forest Service knows where the frog is located, disclosed upfront the risks of drought, and specified a suite of protective measures.

### E. Plaintiffs' brand-new Jack Creek population NEPA claim is no grounds to reverse the district court.

For the first time on appeal, Plaintiffs argue that the Forest Service violated NEPA in not analyzing "how direct harm to individual frogs would affect the Jack Creek population as a whole" and in not analyzing "how the alternatives would affect the population's risk of extirpation." Br. 30, 31. Plaintiffs also argue, for the first time, that the Forest Service should have taken a hard look at "how alternatives would affect the population given the Forest Service's substantive duty to ensure the frog's viability across the Forest." Br. 31.

These claims or issues are forfeited because Plaintiff never raised them below. As Plaintiffs' NEPA district court briefing made clear, Plaintiffs raised three hard-look issues: 1) whether the Forest Service supposedly wrongly dismissed several alternatives; 2) whether it failed to take a hard look related to climate change; and 3) whether its analysis of effects to frogs was inadequate. 1-SER-29-34, 74-76. In their "effects to frogs" hard-look arguments, Plaintiffs did not assert any supposed procedural need to assess effects by addressing the Jack Creek population as a whole, and asserted no NEPA argument premised on a substantive duty to ensure viability. *Id*. It is

inappropriate for Plaintiffs to attempt to reverse the district court on claims/issues never raised below. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546 n.15 (9th Cir. 1991) ("It is well established that an appellate court will not reverse a district court on the basis of a theory that was not raised below."); *Novato Fire Prot. Dist. v. United States*, 181 F.3d 1135, 1141 n.6 (9th Cir. 1999).

Even if this Court were to consider Plaintiffs' new claims, they fail. With regard to the argument that the Forest Service was obliged to assess impacts to the Jack Creek population as a whole, the Forest Service considered grazing's effects on the frog and NEPA did not require a methodology that assessed "the population-level effects." Br. 30. As this Court has established, "[t]he requisite 'hard look' does not require adherence to a particular analytic protocol." *Ass'n of Public Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997). Instead, the appropriate methodology depends "on the variable factors peculiar to that case" and is reviewed "under a rule of reason."

The Forest Service reasonably assessed effects to the frog and rationally explained why tracking frog habitat characteristics was

preferable to estimating frog-population effects. Habitat degradation is the gravest threat to the frog at Jack Creek. Loss and alteration of habitat is "likely the greatest single threat to the persistence of [the frog] within the Jack Creek system." 4-ER-0894. The FEIS explained that a frog population count is "not a reliable benchmark for management actions," because small populations "are prone to wide fluctuations solely due to chance." 2-ER-0203. The Forest Service therefore explained that "habitat characteristics" are more appropriate as markers. *Id.*; 4-ER-0919.

As the Forest Service explained, maintaining habitat protects undetected frogs and maintains the integrity of the riparian wetlands. 2-ER-0203. This methodology is consistent with that taken by FWS, which found that the frogs "are small and cryptic, and detecting individuals" subject to harm or harassment "will be exceptionally difficult" and "not practicable." 3-ER-0432; 1-ER-0030-31 (district court's discussion and affirmation of FWS methodology).

The Forest Service was neither arbitrary nor capricious in tethering its effects analysis to key habitat characteristics rather than trying to measure the effects to the Jack Creek population as a whole.

Per the Forest Service's methodology, the proposed new framework has mandatory standards to conserve key frog habitat characteristics. As the district court found, these standards "are supported by scientific literature regarding the protection of riparian wildlife habitat and the Forest Service's Jack Creek OSF Site Management Plan." 1-ER-0025. *See* 5-ER-0941 (noting that required maximum 35% grazing utilization in frog habitat would keep these areas "in healthy condition" and increase "habitat suitability" for frogs placing eggs); 3-ER-0353, 0361, 0364 (noting the required habitat-conservation standards). The Forest Service's methodology choice, scientific judgments, and technical analysis here merit strong deference. See *Native Ecosystems Council v. Weldon*, 697 F.3d. 1043, 1051 (9th Cir. 2012).

Plaintiffs would rely on an unreported 2023 Idaho district court case, Br. 31, to support a supposed duty to consider risk to the Jack Creek population as a whole, but there the plaintiffs raised a specific population-based NEPA claim in the district court. Here, Plaintiffs never did so. Plaintiffs also cite *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010), Br. 31, but that case involved a substantive ESA challenge to a Biological Opinion, not a procedural NEPA claim; it

simply did not address whether an EIS must adopt a methodology that considers population-wide effects to take a hard look at an action's impact on a species.

If this Court reaches Plaintiffs' new NEPA hard-look claim related to the Forest Service's NFMA duty to ensure viability, it should likewise reject Plaintiffs' arguments. The district court correctly rejected Plaintiffs' substantive NFMA claim that the agency had failed to meet its duty to ensure the viability of species across the forest. 1-ER-0017-18. The Forest Service provided a rational basis for its determination that the new grazing framework "will not contribute to a negative trend in viability" for the frog. 3-ER-0353, 2-ER-0208. Plaintiffs do not appeal that finding. Because the district court already concluded that the Forest Service met its substantive NFMA viability duty, it makes no sense now to consider—for the first time—whether NEPA required the Forest Service to disclose whether the alternatives would interfere with that duty.

//

//

//

## II. The district court correctly concluded that the Forest Service complied with NFMA.

### A. Legal background

Under NFMA, the Forest Service must develop a land and resource management plan for each unit of the National Forest System in order to provide for multiple uses and sustained yield of the various forest resources. 16 U.S.C. §§ 1604(a), (e). Subsequent projects must be consistent with this plan. 16 U.S.C. § 1604(i).

The Forest Service's "interpretation and implementation of its own Forest Plan is entitled to substantial deference," and this Court "defer[s] to the agency's reasonable exercise of its scientific expertise in choosing how best to meet the requirements of its Forest Plan while accommodating the competing interests of environmental, recreational, extractive, and other uses." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.* ("*ONDA*"), 957 F.3d 1024, 1035, 1037 (9th Cir. 2020) (rejecting NFMA challenge to grazing).

"NFMA is about managing competing uses, none to the exclusion of others." *In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017). This Court will conclude the Forest Service violates NFMA "only when the record plainly demonstrates" that the agency "made a clear error in

judgment in concluding that a project meets the requirement of the NFMA and relevant Forest Plan." *ONDA*, 957 F.3d at 1035.

## B. The district court rejected all of Plaintiffs' NFMA claims.

The district court rejected all of Plaintiffs' NFMA claims. 1-ER-0012-18, finding that Plaintiffs relied on "excerpts" from the agency's expert reports but that the expert reports "on the whole" support the Forest Service's final decision. 1-ER-0014-15.

## C. Plaintiffs fail to establish that the Forest Service was arbitrary and capricious.

### 1. The district court correctly rejected Plaintiffs' claims regarding soil provisions.

The record shows the Forest Service evaluated the new grazing framework and rationally found it would maintain or improve soil conditions. Specifically, the Forest Service's soils expert report, 3-ER-0566-607, explained that new framework was consistent with the Forest Plan. *See*, *e.g.*, 3-ER-0595-97, 0602-03. The relevant Forest Plan provision directs that the "cumulative total area of detrimental soil conditions in riparian areas shall not exceed 10 percent of the total riparian acreage with an activity area." 3-ER-0620. The agency's expert found that existing conditions were within this threshold, 3-ER-

0585, accounting for certain sites with problem conditions but also more than 60 meadows, fens, and riparian sites without problems. *Id*.; Br. 36 (conceding that existing soil conditions are within the Forest Plan 10% limit).

Further, the expert report found that the new framework—with effectively implemented mitigation—"would limit impacts on the soil resource to acceptable thresholds of the Forest Plan." 3-ER-0596. *See also* 3-ER-0602-03 (similar finding). The Forest Service met its duty to "support its conclusions that a project meets the requirement of the NFMA and relevant Forest Plan with studies that the agency, in its expertise, deems reliable." *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008) (en banc).

The Forest Service's evaluation is also consistent with the Forest Plan's specific direction that allotment management planning "shall include a strategy for managing riparian areas for a mix of resource uses." 1-SER-91. "NFMA is about managing competing uses, none to the exclusion of others." *In re Big Thorne Project*, 857 F.3d at 976.

The soil provisions in the monitoring and adaptive management plan do not replace those in the Forest Plan. Br. 34. The Forest Plan

standards continue to apply.  Indeed, both the ROD and AMP reference the 10% Forest Plan detrimental-soils provision and the need to meet it. 3-ER-0337; 2-SER-464; 2-ER-0101 (stating that monitoring in the project area "would comply with Forest Plan guidance").  As the district court concluded, the Forest Service's monitoring and adaptive management plan has a rational basis.  1-ER-0010-12.

The monitoring and adaptive management plan contains site-specific provisions that supplement the Forest Plan.  *See* 3-ER-0341 (noting that the provisions are site-specific and will be part of the grazing permit); 4-ER-0623 (agency's botany expert report, noting that the Forest Plan "does not have direction specific to groundwater dependent ecosystems such as fens").

The monitoring and adaptive management plan reflected in the AMP does not conflict with the Forest Plan provision at 3-ER-0620.  The Forest Plan and the monitoring and adaptive management plan measure different things, in different ways, and are not inconsistent. *See* 1-ER-0012 (recognizing that the selection of criteria for monitoring is a matter within the expertise of the Forest Service, citing W.

*Watersheds Project v. U.S. Forest Serv.*, 780 F. Supp. 2d 1115, 1121 (D. Idaho 2011)).

The Forest Plan standard at 3-ER-0620 limits the overall total riparian acreage of detrimental soil conditions to 10% of the riparian acreage in an activity area. The "riparian acreage in the activity area" means the riparian acreage in the entire "west side" (Chemult Ranger District) of the allotment. 3-ER-0585.

The provisions reflected in the AMP, for their part, provide site-specific guidance for ten high-priority fen areas where each fen will be managed for a "desired condition" of 10% or less bare soil, with specific grazing management shifts if this goal is not met. 3-ER-0340, 0345, 0346. For nine fenced areas, there is also a "desired condition" of limiting soil compaction/postholing to a 20% increase in bulk soil density, with specific grazing management shifts if there is a downward trend. 3-ER-0340, 0345, 346. Further, there is an annual limit on alteration in certain pastures and fens to 20%. This 20% provision is not specific to soil—it does not measure soil compaction, soil displacement, soil puddling, or burned soil—but is a general measure of grazing-related disturbance at the pasture/fen. 3-ER-0343, 0344, 3-ER-

0345 (noting consequence of "disturbances" under the 20% provision), 0346.

Plaintiffs mischaracterize the monitoring and adaptive management plan. They say that it allows for 20% bare soil in fens, Br. 35-36, 37. This is wrong. The plan sets a limit at 10%. 3-ER-0345. Plaintiffs say that the plan allows 20% alteration in certain areas. Br. 35. But that does not equate to 20% soil disturbance and does not conflict with Forest Plan's overall acreage provision. Plaintiffs are wrong that the plan allows "twice the level of allowable degradation." Br. 35. The Forest Plan sets the overall acreage limit for detrimental soil conditions in riparian areas, the status quo is within that limit, 3-ER-0585, and the Forest Service's soil expert rationally predicted that the new framework would be consistent with that limit. 3-ER-0595-97, 0602-03. The agency's "interpretation and implementation of its own Forest Plan is entitled to substantial deference." *ONDA*, 957 F.3d at 1035, 1037.

Plaintiffs speculate that the Forest Plan standard at 3-ER-0620 may be exceeded because the new framework expands grazing in riparian areas. Br. 36-37. But the district court's conclusion is

unchallenged that the Forest Service rationally predicted that better dispersion and decreased resource impacts will occur because nearly the same amount of grazing will occur over a much larger riparian acreage. 1-ER-0008-09. The record supports the Forest Service's expert prediction that resource conditions will be maintained or improved. Further, both the ROD and AMP establish that the Forest Service is well aware of the 3-ER-0620 Forest Plan standard and will take action to meet it. 2-SER-464, 3-ER-0338.

Nor does the monitoring and adaptive management plan conflict with the Forest Service's view regarding good conditions in fens, Br. 37, because it sets the desired high-value fen condition at 10% or less bare soil. 3-ER-0340, 0345, 0346. This is straight in line with the science and the Forest Service's long-standing view. 2-ER-0137, 151.

Plaintiffs, finally, question whether the monitoring and adaptive management plan reflected in the AMP is consistent with broad, open-ended Forest Plan provisions to "maintain and improve" conditions in meadows, riparian areas, hydrologic systems, and riparian habitat. Br. 38 (citing 3-ER-0612, 0618). But as the district court found, this argument "plainly ignores" the agency's rational findings that the new

framework will result in greater periods of forage recovery, reduced resource impacts, and other benefits. 1-ER-0015-16 (citing 3-ER-0359). Further, the "maintain and improve" provisions that Plaintiffs cite are "broad planning standard[s]" and the caselaw "counsels against enforcing open-ended standards in fact-specific contests." *ONDA*, 957 F.3d at 1037 (rejecting NFMA claim premised on "maintain or increase" Forest Plan standard).

The Forest Service reasonably exercised its scientific expertise in choosing how to meet the requirements of its Forest Plan while accommodating competing uses. *Id.* at 1037. Plaintiffs fail to show that the record "plainly demonstrates" that the agency "made a clear error in judgment" in finding the new framework meets the requirements of the Forest Plan. *Id.* at 1035.

## 2. The district court correctly rejected Plaintiffs' claims regarding riparian provisions.

The record shows that the Forest Service rationally evaluated the new grazing framework and found under NFMA that it would maintain or improve hydrologic resource conditions. *See*, *e.g.*, 3-ER-530-31, 3-ER-0550-61.

The Forest Plan's streambank provisions are consistent with those in the monitoring and adaptive management plan. The Forest Plan measures long-term streambank "degradation," and the monitoring and adaptive management plan measures short-term "alteration"; each term has a distinct meaning. The Forest Plan requires for Jack Creek that livestock be managed "so that no more than 5 percent of the stream banks in a stream reach . . . exhibit degradation caused or perpetuated by livestock." 3-ER-0610. The monitoring and adaptive management plan, for its part, requires that streambank alteration each year remain within 20% at the Jack Creek pastures. 3-ER-0344. If that is exceeded, the area will be rested. 3-ER-0345.

The Forest Service recognizes that streambank alteration is different from streambank degradation. *See* 1-ER-0015 (district court's noting difference between "alteration" and "degradation"). Streambank alteration is "an annual or short-term indicator" of direct disturbance of the streambank, 4-ER-0717, and streams can repair some disturbance each year. In contrast, streambank degradation is a "long-term" condition. 3-ER-0355, 4-ER-0717.

The Forest Service had FWS's Biological Opinion in its record before it authorized the new framework, 3-ER-0354, 0359, 0364, and the Biological Opinion supports the use of a 20% annual streambank alteration standard. As FWS found, this standard "is expected to allow for the maintenance of or an upward trend in proper stream function." 3-ER-0407. The annual standard "is consistent with" recommendations in the literature "to maintain adequate streambank conditions." 3-ER-0406. Further, the standard is tied to the specific needs of the frog. *See* 3-ER-0425-26.

The monitoring and adaptive management plan and Forest Plan are also consistent, because the monitoring and adaptive management plan provides that long-term "streambank stability" in the Jack Creek pastures remain 95% or greater. 3-ER-0345. This provision for 95% streambank stability dovetails with the Forest Plan's 5% streambank degradation limit. 3-ER-610. As the Forest Service found, the stability of a streambank is a good long-term measure of the streambank condition related to degradation. 3-ER-0355.

Plaintiffs complain that streambank stability will only be measured every five to ten years, Br. 39, but the Forest Plan does not

establish that streambank stability/degradation should be measured more frequently. 3-ER-0610. Further, because the Forest Service recognizes that streambank stability/degradation is a "long term" condition rather than an annual indicator like streambank alteration (4-ER-0717), it is rational to measure degradation less frequently. *See* 5-ER-1002 (noting that "long-term trend data" will be collected via streambank stability measurements on 5–10-year interval).

The Forest Service reasonably exercised its scientific expertise in choosing how to meet the requirements of its Forest Plan while accommodating competing uses. *ONDA,* 957 F.3d at 1037.

> **3. Plaintiffs' trespass/noncompliance arguments show no grounds to reverse the district court.**
>
> **a. The Forest Service under NFMA rationally authorized the new framework in light of unauthorized grazing.**

Among a host of resource considerations, the agency considered prior unauthorized grazing and predicted that some unauthorized use will occur again (*see* 4-ER-0707, 0708, 0709). At the same time, the agency told that public that opening Jack Creek pastures to grazing will reduce unauthorized use because it will allow controlled use in an area

that was closed before but prone to the majority of unauthorized use. 2-ER-0080, 0091.

To minimize future unauthorized use, the Forest Service built "teeth" into its monitoring and adaptive management plan. The Forest Service committed to "strictly adhere" to that plan. 3-ER-0360. If there is unauthorized or excessive grazing, the plan requires restrictions to grazing that become more severe if problems recur. 3-ER-0345-46. Problems also require timely permit action by the Forest Service and reporting to FWS. 1-ER-0011, 3-ER-0360. If grazing results in excess or unauthorized use in frog habitat, or the permittee is unable to remove cattle in an appropriate manner from water sources, FWS will be notified, and ESA re-initiation may be triggered. 3-ER-0432, 0433. It was therefore rational for the Forest Service in its expertise to predict that these required measures will minimize unauthorized use and/or its impacts to resources.

The record amply supports that the Forest Service is thoroughly engaged in protecting the frog and managing other resources to minimize the effects of grazing by monitoring the effects of grazing on various resource indicators and implementing site-specific limits. *See*

*ONDA*, 957 F.3d at 1037; 1-ER-0011 (district court ruling).  The record

shows the Forest Service was neither arbitrary nor capricious under

NFMA in approving the new framework.

### b. Plaintiffs fail to show the Forest Service was arbitrary and capricious.

Plaintiffs' trespass/noncompliance NFMA arguments fail to

establish grounds to reverse the district court.  As a fundamental

matter, Plaintiffs do not establish appropriate grounds for a NFMA

violation because they fail to identify a Forest Plan standard properly

enforceable under NFMA.  The "maintain and improve" provisions they

reference (Br. 40, 46) are open-ended and broad planning standards

which the caselaw "counsels against enforcing" in "fact-specific

contexts." *ONDA*, 957 F.3d at 1037.  Further, Plaintiffs ignore that the

Forest Plan mandates that allotment planning "include a strategy for

managing riparian areas for a mix of resource uses."  1-SER-91.

To extent that Plaintiffs argue the Forest Service violated Forest

Plan viability provisions (Br. 40, 46), the district court considered and

rejected that claim and Plaintiffs fail to even reference the district

court's rationale or identify how it erred.  1-ER-0017-18.  Nor do

Plaintiffs confront the agency's rational explanation of its reasons for

determining the framework is consistent with the Forest Plan's viability provisions. 3-ER-0353-54.

Plaintiffs argue that the monitoring and adaptive management plan violates NFMA, because they think some of its measures will not work. Br. 42-43. But the district court rejected Plaintiffs' NEPA claim that the agency did not sufficiently support its determination that the plan would be effective, 1-ER-0010-12, and Plaintiffs have not appealed that aspect of the district court's ruling. Plaintiffs cannot change a rejected NEPA claim into a viable NFMA claim on appeal when they fail to challenge the underlying district court ruling that the agency supported its conclusions regarding the plan. 1-ER-0012.

The monitoring and adaptive management plan calls for fence improvements and water troughs, 3-ER-0347-49, but Plaintiffs say those are irrational provisions. Br. 42-43. Plaintiffs' attack on fences and water troughs is strange, because the district court found that fencing has "improved" frog habitat conditions and that Plaintiffs "zealously" advocated for it. 1-ER-0026-27 (quoting *Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-cv-737-CL, 2016 WL 10637010, *11 (D. Or. Sept. 12, 2016). As the district court recognized,

"fencing efforts have not been an irrational waste of resources and should not be abandoned as a mitigation measure."  2016 WL 10637010 at *11.  Further, new water troughs "will help control cattle access and limit effects of grazing on frogs."  *Id*.  Plaintiffs fail to explain what made it suddenly arbitrary to predict utility from fencing and water troughs.

To attack fences and water troughs, Plaintiffs also cite 5-ER-1001 but that 2017 document shows that the agency has conducted detailed and diligent monitoring of unauthorized use.  5-ER-1000-04.  There was light (10% utilization) unauthorized use, the agency found that unauthorized use was linked to <u>the lack of</u> a water trough, and the agency commenced permit cancellation procedures in response.  5-ER-1000, 1001.

Plaintiffs are wrong that the Forest Service "overlooked" prior unauthorized grazing.  Br. 40.  The agency surveyed prior unauthorized use over a ten-year period, and found "typically" 5-10% forage utilization.  2-ER-0074.  The agency's wildlife expert also acknowledged in her signed report that unauthorized use "is likely to occur," and can affect frogs and their habitat.  4-ER-0707, 0708, 0709.

Plaintiffs focus on the agency's supposed error in its survey of prior unauthorized use. Br. 41. But Plaintiffs chose not to raise this issue in their administrative objections; the issue is forfeited. 2-SER-312-99. Plaintiffs cannot show district court error regarding an issue they did not air in their exhaustive administrative objections. *See supra* Argument I.D.1.[1] Further, Plaintiffs' error argument misses the point that the Forest Service believes unauthorized use will recur and therefore designed new protections to target the problem, and believes the new framework will relieve the majority of unauthorized use by allowing controlled grazing in areas that were closed but prone to unauthorized use. 2-ER-0080, 0091. Plaintiffs also fail to contradict the survey's overarching finding that unauthorized grazing typically resulted in utilization of 5-10%; they note only that such grazing in one instance resulted in 24% utilization. Br. 44.

---

[1] In 2018, the district court reviewed the Forest Service's survey in the FEIS and found that the agency had "appropriately accounted for unauthorized use" and "appropriately incorporated that actual use into its viability determinations." *Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1-14-cv-00737-CL, 2018 WL 7254704, *3-*4 (D. Or. Dec. 10, 2018), *adopted,* 2019 WL 982383 (D. Or. Feb. 28, 2019).

Plaintiffs rely on their expert Simpson (Br. 42, 44, 45) and cite fragments from Forest Service expert reports to argue that grazing can lead to soil deterioration/degradation. *See* Br. 44. But the agency's experts acknowledged that grazing could affect various resources and provided a rational basis to predict Forest Plan consistency in the multiple-use context of NFMA. *See*, *e.g.*, 3-ER-0512-65, 3-ER-0566-612, 4-ER-0622-89. Nor was the agency obliged to follow the opinions in Simpson's litigation declarations. As the district court found, the opinions of Plaintiffs' experts "are not binding on the agency." 1-ER-0014. In the NFMA context, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts." *Lands Council v. McNair*, 537 F.3d 981, 1000 (9th Cir. 2008) (en banc).

To save their NFMA claim, Plaintiffs would also rely on several documents that are not in the administrative record. Br. 42 n.12. Plaintiffs argue that these documents should have been in the record, but they never moved below to supplement or complete that record. *See* 5-ER-1163-65. It is inappropriate now for Plaintiffs to attempt to alter the administrative record. When applying the APA's arbitrary and

capricious standard of review, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

To try to show an NFMA violation, Plaintiffs cite part of the permittee's comments on the DEIS, Br. 42, omitting the permittee's recognition of the Forest Service's "careful analysis" regarding interactions between livestock and other resources. 3-ER-0456. Plaintiffs also omit that the Forest Service responded to the DEIS comments by deciding to adopt elements of Alternatives 3 and 5, with the permittee's own proposed framework "similar" to Alternative 5. 1-SER-163; 3-ER-0355-56, 3-ER-0366-67. And as the district court noted, the permittee did not object to this re-configuration. 1-ER-0010.

Plaintiffs also argue the Forest Service violated NFMA because it failed to consider climate change in finding compliance with its Forest Plan. Br. 45-46. But this issue is forfeited. Plaintiffs failed to raise this NFMA argument at the district court, and failed to discuss climate change in their administrative objections. 1-SER-2-86; 2-SER-312-99. Further, nothing in the Forest Plan speaks to climate change; an

alleged failure to discuss climate change is thus not a basis for a NFMA violation. Plaintiffs rely on the 2014 Cummings litigation declaration, 5-ER-1050-53, but that did not even address grazing. Further, there is no Forest Plan direction specific to fens, which Plaintiffs argue will be impacted by drought and climate change, 4-ER-0623, and in 2014 the district court found, "Plaintiffs' experts admit that the effects of drought or grazing on fens are unknown." *Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-cv-737-CL, 2014 WL 2611344, *5 (D. Or. June 11, 2014).

Plaintiffs fail to show that the record "plainly demonstrates" that the agency "made a clear error in judgment" in finding the new framework meets the requirements of the Forest Plan. *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020).

### III. The district court correctly concluded that FWS complied with the ESA.

#### A. Legal background

Under the ESA, a federal agency must ensure that any action it authorizes is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of such species' critical habitat. 16 U.S.C. § 1536(a)(2). If

the agency determines that its action is "likely to adversely affect" a listed species or critical habitat, it must engage in formal consultation with FWS.  *See San Luis & Delta-Mendoza Water Auth. v. Jewell*, 747 F.3d 581, 596 (9th Cir. 2014).  At the conclusion of formal consultation, FWS must provide a Biological Opinion stating whether the proposed agency action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  16 U.S.C. § 1536(b)(3)(A).

## B. The district court rejected Plaintiffs' ESA claims.

The district court rejected all of Plaintiffs' ESA claims against the Biological Opinion, most of which are not at issue in this appeal.  1-ER-0022-31.  Plaintiffs argue that the district court erred only in rejecting their claim that the Biological Opinion was arbitrary and capricious with regard to climate change, and in rejecting their claim that the Biological Opinion was arbitrary and capricious in relying on certain mitigation measures.

//

//

### C. Plaintiffs fail to establish that FWS was arbitrary and capricious.

#### 1. The district court correctly rejected Plaintiffs' climate-change claim against the Biological Opinion.

##### a. The Biological Opinion was neither arbitrary nor capricious.

In the Biological Opinion, FWS rationally analyzed the effects of the Forest Service's proposed action to revise livestock grazing. 3-ER-0372; 50 C.F.R. § 402.14(g)(3) (2015)[2]; 50 C.F.R. § 402.02 (defining "effects" using "reasonably certain to occur" standard).

The Biological Opinion emphasized that recurrent and severe drought conditions have negatively impacted the Jack Creek frog population, with cattle grazing an added pressure. 3-ER-0399, 0403, 0415. Cattle use of water in drought conditions can dry up water sources used by frogs. 3-ER-0424. Further, cattle trampling of frogs and alterations to habitat elements by cattle may compound the impacts on frogs in drought conditions. 3-ER-0412. The Biological Opinion ultimately concluded that mandatory strategies under the proposed action to prevent livestock access to Jack Creek in defined low-

---

[2] Defendants cite the version of the regulations applicable at the time of the May 2018 Biological Opinion.

water conditions would minimize such effects. 3-ER-0384-85, 0413, 0424, 0429, 0432, 0433-34; 1-ER-0027-28.

The district court properly concluded that further evaluation in the Biological Opinion would have been speculative regarding the effects of climate change on the frog. As the district court found, "no studies" at the time of the May 2018 Biological Opinion "examined the effects of climate change on the Oregon spotted frog" and "any further discussion by the agency on this issue would have been speculative." 1-ER-0028.

The district court's conclusion is well supported by the record. The Biological Opinion cited and relied upon FWS's 2014 rule listing the frog under the ESA. 3-ER-0372, 0436. In the rule, FWS discussed in depth climate change as a factor affecting the frog. 3-ER-0491-93. FWS found that the frog's "response to climate change is likely to vary across the range, and the population-level impacts are uncertain." 3-ER-0493. As FWS found in the rule, there was insufficient information to evaluate frog habitat or population trends vis a vis climate change, or to make predictions about future trends and whether the frog will be significantly impacted by climate change. *Id.* FWS emphasized that it

was not "aware of any data on an appropriate scale to evaluate habitat or population trends for the Oregon spotted frog or to make predictions about future trends and whether the species will be significantly impacted." *Id*.

Climate change formed part of the Biological Opinion's analysis, and Plaintiffs cannot establish that *how* the Biological Opinion took that factor into account was arbitrary and capricious. On the one hand, as the Biological Opinion noted, the loss of frog habitat and other impacts on the species are "exacerbated" by the introduction of reed canarygrass, non-native predators, and "potentially" by climate change. 3-ER-0397; 1-ER-0027. On the other hand, the Biological Opinion cited a published study documenting that a moderate intensity of cattle grazing offset the negative climate change effects on wetlands by maintaining habitat for another amphibian—an endangered California salamander. 3-ER-0409 (citing 3-SER-531-37). That study indicated that "grazing can confound hydrologic changes driven by climate change and play a critical role in maintaining the hydrologic suitability of vernal pools for endangered aquatic invertebrates and amphibians." 3-

SER-531. How the Biological Opinion addressed climate change in the context of limited data was neither arbitrary nor capricious.

Plaintiffs argue it irrational that the Biological Opinion did not study "the combined effects of climate change and grazing on Oregon spotted frogs." Br. 49. But as the district court found, Plaintiffs failed "to point to any study" that the Biological Opinion "should have consulted." 1-ER-0028. In a Biological Opinion, FWS is not required "to conduct new tests or make decisions on data that does not yet exist." *San Luis & Delta–Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014).

This Court's ruling in *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 740 (9th Cir. 2017), is instructive here. 1-ER-0028 (district court's reference to case). There, this Court rejected a climate change effects challenge to a Biological Opinion, where the agency noted that climate change will affect the sea turtle but that there was "no available data from which [the agency] could credibly project" the effects of climate change on that species. *Turtle Island*, 878 F.3d at 740.

Here, as in *Turtle Island*, the Biological Opinion was based on the best available science. *See* 16 U.S.C. § 1536(a)(2). The best available science indicates that drought and grazing are a threat to the Jack Creek frogs, and that climate change is relevant but that there is a lack of further available information to inform a more specific analysis. What constitutes the best available science is "itself a scientific determination deserving of deference," and courts should be "especially wary of overturning such a determination on review." *Locke*, 776 F.3d at 995 (internal quotations omitted).

As the district court also noted, the May 2018 Biological Opinion has a limited shelf life—it is valid only through 2027.[3] 3-ER-0385, 1-ER-0027 n.5. Given the Biological Opinion's short-term validity, FWS rationally addressed the threat presented to the frog by drought, in the context of grazing, and avoided speculation in further assessing climate change's effects on the frog based on nonexistent data. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336-37 (9th Cir. 1992) (affirming a

---

[3] For any grazing after December 2027, a new Biological Opinion will be required.

Biological Opinion when measures are premised on a "reasonable evaluation of available data, not on pure speculation").

### b. Plaintiffs' arguments fail to show the Biological Opinion was arbitrary and capricious.

Plaintiffs completely ignore *Greenpeace Action* and misrepresent *Turtle Island*'s climate-change discussion,[4] but focus on string-cited cases. Br. 49-50. Those cases are off point because they involved different species and Biological Opinions that failed to account for existing scientific information on effects to those particular species. Illustratively, in *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861 (D. Or. 2016), ocean-going fish species were listed in the early 1990s, but a 2014 Biological Opinion failed to adequately account for "a significant amount of new scientific information on the effects of climate change." *Id*. at 869, 923.

Here, by contrast, the frog was listed in 2014 and the 2018 Biological Opinion did not ignore any studies regarding climate change's effects on the frog. The Biological Opinion rationally

---

[4] Plaintiffs say *Turtle Island* ruled against an agency related to climate predictions, Br. 54, when in fact *Turtle Island* ruled in the agency's favor on that issue.

accounted for the available science, including science suggesting that grazing may benefit endangered amphibians in the context of climate change.  3-SER-531.

Plaintiffs rely on *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir. 2018), but that case does not assist them.  Br. 50-51.  In *Zinke*, FWS decided not to list a fish species under the ESA, but the no-listing decision cited evidence that climate change will specifically threaten that species' habitat factors.  *Id.* at 1073.  There, FWS failed to explain why the uncertainty of climate change favored not listing the species.  *Id.*  Here, by contrast, FWS decided to list the frog in 2014 and found a lack of climate-change related data to evaluate habitat/population trends for the frog or to make predictions about future trends.  3-ER-0493.  The 2018 Biological Opinion did not ignore available scientific information about the frog, and the record provided no reason to conclude that the uncertain effects of climate change on the frog would be so great during the Biological Opinion's short lifetime to undermine the agency's no-jeopardy finding.

Plaintiffs also rely on *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259 (4th Cir. 2022), but that case is irrelevant here.  There, the

Fourth Circuit rejected a Biological Opinion regarding effects to two fish species from a new pipeline project. The Biological Opinion stated that climate change was an "increasing threat" to one species but did no further analysis, and documents in the record indicated that climate change was a "persistent threat" to the other species, but the Biological Opinion ignored the issue. *Id.* at 276. Here, by contrast, the Biological Opinion was appropriately informed by FWS's 2014 frog listing rule; there was simply a lack of scientific information specifically addressing the effects of climate change on the frog or its habitat, beyond the agency's recognition that drought is a stressor on the species.

Plaintiffs complain that the Biological Opinion failed to include information from the 2014 listing rule that climate change is a threat to populations in the Williamson sub-basin, within which Jack Creek is located. Br. 49. But the table on 3-ER-0495 generally listed "climate change" for each and every sub-basin as one of a host of factors in a "cumulative effects" threat finding for the frog's listing. The table also cautioned that a threat in a sub-basin does not necessarily apply to all locations in the sub-basin. 3-ER-0495. More pertinently, as FWS emphasized two pages prior with regard to climate change, it was not

aware of any appropriate data "to evaluate habitat or population trends" for the frog "or to make predictions about future trends and whether the species will be significantly impacted." 3-ER-0493.

Plaintiffs concede that the Biological Opinion recognized that drought negatively impacts the frog and that it found that grazing would be a concern regarding the frog during drought conditions. Br. 51-52. Nevertheless, Plaintiffs would fault FWS for failing to consider "how climate change will likely affect this dynamic by making drought more frequent or severe." Br. 52. But none of the documents they cite for this argument state that climate change will make droughts in this particular area more frequent or severe on the timeframe considered. *See* 4-ER-0897, 3-ER-0492-93, 0508. Nor is the Biological Opinion the appropriate or necessary vehicle for a long-term, sweeping trend analysis for the species. The Biological Opinion is only valid until 2027 and it addressed the effects of a proposed new framework to adjust long-standing grazing in one allotment.

Plaintiffs also criticize the Biological Opinion for stating that drought is periodic and may occur "perhaps" once a decade, Br. 52, omitting the Biological Opinion's statement two sentences later that low

water from drought is "probably the most severe threat" to the Jack Creek frog. 3-ER-0403. Plaintiffs also omit the Biological Opinion's finding that drought years occurred from 2000 through 2004 and in 2014. 3-ER-0415. *See also* 3-ER-0418-19 (Biological Opinion's recognition that frog susceptibility to the effects of grazing is "particularly true during drought years"). At bottom, the Biological Opinion squarely identified drought as a risk to the frog in the context of grazing—and rationally looked to a specific low-water strategy to minimize that risk. 3-ER-0415, 0417, 0418-19.

Plaintiffs rely on their expert Simpson's litigation declarations. Br. 52. But Simpson is a retired biologist, not a drought or climate change expert, and her declarations were not in FWS's administrative record for the Biological Opinion. Nor did Plaintiffs ask the district court for judicial notice regarding historic drought conditions or argue below that FWS needed to collect further data regarding historic drought; these issues are waived. Br. 52 n.14; 1-SER-2-86. Plaintiffs would also rely on a fragment of a 2009 draft Forest Service report, (Br. 53, citing 5-ER-1055-57) but the Biological Opinion rationally relied on the 2011 final report instead. 3-ER-0438, 3-ER-0897-920.

Plaintiffs, finally, mischaracterize the proposed action that the Biological Opinion addressed. *See*, *e.g.*, Br. 53 (describing the proposed action as "opening up miles of Jack Creek to grazing"). In fact, the proposed action includes new science-grounded grazing utilization standards, new federal protections to private lands with prime frog habitat, fencing improvements, water-development upgrades, and other allotment-management refinements. 3-ER-0372-85 (Biological Opinion's description of proposed action).

> **2. Plaintiffs fail to establish the Biological Opinion's reliance on certain mitigation measures was arbitrary and capricious.**

> **a. FWS was neither arbitrary nor capricious.**

In the Biological Opinion, FWS adequately supported its conclusion that the proposed action would not jeopardize the continued existence of the Oregon spotted frog as a species. 3-ER-0429. In reaching this "no jeopardy" conclusion, the Biological Opinion relied on mandatory provisions to mitigate harm to the frog connected to grazing. *See*, *e.g.*, 3-ER-0417-19. Under the ESA, such mitigation must be reasonably specific, certain to occur, capable of implementation, subject to enforceable obligations, and address the threats to the species as

appropriate under the ESA.  *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020).

The Biological Opinion rationally relied on such mitigation in reaching its "no jeopardy" finding.  *See, e.g.*, 3-ER-0383-85, 0411, 0413-17, 0429, 0433-34.  As a central mitigation measure—unchallenged in this appeal—the Biological Opinion set a mandatory upper limit of 35% grazing forage utilization in frog habitat.  3-ER-0418, 0433.  This utilization standard is grounded in literature regarding the protection of frog and riparian wildlife habitat.  *See, e.g.*, 3-ER-0406 (citing literature and finding 35% standard "is expected to maintain or improve riparian system function").  The Biological Opinion also rationally relied on a mandatory 20% bank alteration standard, which is unchallenged in this appeal.  3-ER-0418, 0433.  This standard "is consistent with" recommendations in the literature "to maintain adequate streambank conditions," 3-ER-0406, and the specific needs of the frog.  *See* 3-ER-0425-26; 1-ER-0025 (district court's unappealed ruling regarding reliance on 35% and 20% standards).

The Biological Opinion also rationally relied on mandatory design features in the new framework to help protect frogs, including short

grazing duration in the pastures, riparian fencing, and alternate (off-channel) water sources for cattle. 3-ER-0413, 0418, 0424, 0426, 0427.

Further, the Biological Opinion rationally relied on mandatory adaptive management provisions designed to prevent livestock access to Jack Creek in low-water/drought conditions. 3-ER-0417, 0384-85. These provisions are expected to mitigate the harm to individual frogs that may aggregate in the creek in such conditions. 3-ER-0414, 0416-17, 0429. When water levels in the perennial section of Jack Creek become intermittent, pasture gates will be closed or temporary fencing installed to prevent livestock access to the creek. 3-ER-0385, 0419. If that does not succeed, livestock will be completely removed. 3-ER-0385. For the naturally intermittent section of Jack Creek, when water levels drop below a defined limit, pasture gates will be closed or temporary fencing installed to prevent livestock access. 3-ER-0385, 0417, 0419. If that does not succeed, livestock will be completely removed. 3-ER-0385.

It was neither arbitrary not capricious for the Biological Opinion to leave the specific timing of low-water monitoring to the discretion of the Forest Service. The Forest Service has a strong interest in complying with the Biological Opinion and avoiding any harm to the

frog that could require mandatory reporting to FWS and that could animate an ESA claim against it. *See* 3-ER-0360-61. Plaintiffs cannot establish the Biological Opinion is irrational because they believe the Forest Service will not be diligent in its expert monitoring and permit administration work. "[T]here is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations." *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993). "T]his presumption stands unless there is irrefragable proof to the contrary." *Id.* The Biological Opinion presumes good faith and diligent actions by the Forest Service to conserve the frog. The district court correctly rejected Plaintiffs' argument that "monitoring will be left to chance or otherwise abdicated to the permittee." 1-ER-0026.

The stakes for the permittee and the Forest Service are high in needing to comply with the Biological Opinion. Under the permittee's grazing permits, its "not meeting or following any part of" the Biological Opinion "will violate the terms" of the permit. 2-SER-469, 474, 478. "Any instance of excess use will result in a timely permit action as instructed by Forest regulations and policy and be reported to [FWS]."

3-ER-0342.  And for the Forest Service, it must "strictly adhere" to the monitoring and adaptive management plan, including the low-water provisions, in order to avail itself of the exemption from ESA liability for incidental take that FWS issued along with the Biological Opinion. 3-ER-0360, 3-ER-0431.  Further, the Biological Opinion requires that the Forest Service reinitiate formal ESA consultation if new information reveals that the effects of the grazing framework may affect the frog in a manner or extent beyond that addressed in the Biological Opinion.  3-ER-0435.  "If an action agency fails to carry out the mitigation measures contained in a [Biological Opinion], it must re-initiate consultation with FWS." *Ctr. for Biological Diversity*, 982 F.3d at 743.

Accordingly, it was neither arbitrary nor capricious for FWS to assume the Forest Service will take drought conditions and frog conservation seriously.

### b. Plaintiffs' arguments fail to establish the Biological Opinion was arbitrary and capricious.

Plaintiffs argue that it was irrational for FWS to rely on fencing as a mandatory mitigation measure, because prior fences have not worked at Jack Creek.  Br. 55-56.  But Plaintiffs stated that fencing

Jack Creek "would be a very effective measure that should be used." 1-SER-162. Further, the sole authority for Plaintiffs' anti-fencing argument is the district court's discussion in *Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-cv-737-CL, 2016 WL 10637010 (D. Or. Sept. 12, 2016). But the district court there specifically found that fences have improved frog habitat conditions and that fencing "should not be abandoned as a mitigation measure." 2016 WL 10637010 at *11. The district court did not err in rejecting Plaintiffs' argument. 1-ER-0026-27.

Plaintiffs argue that "long delays" in removing cattle after discovery of low-water conditions are not "hypothetical." Br. 58. But they reference a prior (2014) situation before the frog was listed under the ESA and before the development of specific, mandatory protective measures that are linked to the frog's needs and that have significant ESA and permit implications. If cattle were to continue to graze in Jack Creek in low-water conditions and after a Forest Service order to remove, those circumstances would now require immediate ESA action. As the Biological Opinion stated, "[a]ny deviation from the proposed action that increases exposure of Oregon spotted frogs to livestock

grazing will constitute exceedance of the exempted take level requiring immediate coordination with [FWS]." 3-ER-0432.

Plaintiffs complain that an internal draft of the Biological Opinion stated that that excluding cattle from Jack Creek would significantly reduce the likelihood of frog exposure to grazing, but the final Biological Opinion stated that "excluding cattle from Jack Creek" would entirely eliminate the likelihood. Br. 56 (citing 3-ER-0417). But if cattle are excluded, it is elementary that frogs will not be exposed to them. Further, the Biological Opinion noted that the exclusion strategy would not necessarily work perfectly. Plaintiffs fail to acknowledge multiple statements in the Biological Opinion that clarify that frog exposure will be greatly reduced, if not eliminated, by the low-water provisions. The lead sentence in the paragraph at issue states that estimates of frog trampling "are expected to be greatly reduced" under the adaptive management plan. 3-ER-0417. The page before, the Biological Opinion emphasized that because of "shallow water habitat and isolated pools" at Jack Creek, it "cannot eliminate the possibility of trampling" of frogs during grazing. 3-ER-0416. Further, the Biological Opinion found that the low-water provisions would "minimize" (not eliminate) impacts to

frogs.  3-ER-0414.  Finally, in its "Overall Findings" section, the Biological Opinion emphasized that the proposed grazing "would not completely remove the risk of trampling."  3-ER-0418.

Plaintiffs cite *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 918 (D. Or. 2016) for the proposition that FWS should have considered how climate change may affect the selected mitigation measures.  Br. 58.  But as Defendants explained above, *supra* Argument III.C.1, further analysis of climate change beyond what the agency already provided would have been speculative. Plaintiffs also rely on *Save Our Cabinets v. U.S. Fish & Wildlife Serv.*, 255 F. Supp. 3d 1035 (D. Mont. 2017).  Br. 59.  But there, proposed mitigation in the context of a new silver/copper mine "at best" would result in the same results as before its implementation, undercutting the agency's "blanket reliance" on the mitigation's efficacy "to more than make up for" the new mine's impacts.  *Id*. at 1063.  That is why the agency was arbitrary and capricious in not considering the mitigation's "potential inadequacy."  *Id*.

Here, by contrast, the required mitigation measures—including a 35% grazing limit, a 20% bank alteration limit, fencing, upgraded water

sources, the low-water plan—are all rationally linked to minimizing harm to the frog and an adequate basis for the Biological Opinion's "no jeopardy" finding. FWS conducted a reasonable evaluation of the relevant information and reached a conclusion that was neither arbitrary nor capricious. *See Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1033 (9th Cir. 2020).

## CONCLUSION

For these reasons, this Court should affirm the district court's judgment. Should this Court instead reverse on any ground, it should not vacate the agency's actions but should instead remand to the district court, where the parties may present full briefing on any appropriate remedy.

Dated this 5th day of May, 2023.

Respectfully submitted,

NATALIE K. WIGHT
United States Attorney
District of Oregon
KEVIN C. DANIELSON
Executive Assistant United States
Attorney

*/s/ Sean E. Martin*
SEAN E. MARTIN
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32-1 of this Court, I hereby certify that the foregoing brief complies with the applicable length limit. The brief contains 13,774 words, excluding the items exempted by FRAP 32(f). I also certify that the brief's type size and typeface comply with FRAP 32(a)(5) and (6). The brief uses a proportionately spaced font (Century Schoolbook) and has a typeface of 14-point.

DATED this 5th day of May, 2023.

*/s/ Sean E. Martin*
SEAN E. MARTIN
Assistant United States Attorney

## STATEMENT OF RELATED CASES

Pursuant to Rule 28-2.6 of this Court, counsel for Defendants is unaware of any related cases currently pending in this Court.

DATED this 5th day of May, 2023.

/s/ Sean E. Martin
SEAN E. MARTIN
Assistant United States Attorney