No. 22-35706

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

WESTERN WATERSHEDS PROJECT ET AL.,
*Plaintiffs-Appellants*,

v.

DOUGLAS C. MCKAY ET AL.,
*Federal Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Oregon
No. 1:19-cv-00516-MC
Hon. Michael McShane

---

## PLAINTIFFS-APPELLANTS' REPLY BRIEF

---

Elizabeth H. Potter
Lauren M. Rule
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
epotter@advocateswest.org
lrule@advocateswest.org
*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

ARGUMENT ............................................................................................2

I. THE EIS FAILED TO TAKE A HARD LOOK AT THE DIRECT
   IMPACTS OF GRAZING ON OREGON SPOTTED FROGS. ...............2

    A. The EIS did not analyze the direct impacts of the alternatives
   on Oregon spotted frogs....................................................................4

    B. The EIS brushed aside the serious risks that low water and
   climate change pose to the Jack Creek population. ........................9

    C. Plaintiffs exhaustively raised their concerns to the agency............12

II. POST-HOC RATIONALIZATIONS DO NOT SHOW THAT THE
    AMP WAS CONSISTENT WITH THE WINEMA FOREST PLAN. ...15

    A. Riparian soil standards ..................................................................16

    B. Streambank standard ......................................................................19

    C. Trespass ........................................................................................20

III. FWS ARBITRARILY IGNORED THAT CLIMATE CHANGE
     AND MITIGATION UNCERTANTIES WILL EXACERBATE
     IMPACTS DURING LOW WATER CONDITIONS. ...........................23

    A. Climate change.............................................................................24

    B. Mitigation measures ......................................................................28

CONCLUSION ........................................................................................30

**TABLE OF AUTHORITIES**
**Cases**

*Alaska Airlines, Inc. v. United Airlines Inc.*,
  948 F.2d 536 (9th Cir. 1991)........................................................................13

*All. for the Wild Rockies v. U.S. Forest Serv.*,
  907 F.3d 1105 (9th Cir. 2018)................................................................18, 20

*Allen v. Santa Clara Cnty. Corr. Peace Officers Ass'n*,
  38 F.4th 68 (9th Cir. 2022) ................................................................12–13

*Appalachian Voices v. U.S. Dep't of Interior*,
  25 F.4th 259 (4th Cir. 2022) ........................................................26, 27, 28

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998)..............................................................2–3, 9

*Concerned Friends of the Winema v. U.S. Forest Serv.*,
  No. 1:14-cv-737-CL, 2016 WL 10637010 (D. Or. Sept. 12, 2016)..12, 20, 21

*Concerned Friends of the Winema v. U.S. Forest Serv.*,
  No. 1:14-cv-737-CL, 2016 WL 7254704 (D. Or. Feb. 28, 2019)................21

*Ctr. for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020)....................................................................30

*Ctr. for Biological Diversity v. Zinke*,
  900 F.3d 1053 (9th Cir. 2018)............................................................25, 28

*Dep't of Transp. v. Public Citizen*,
  541 U.S. 752 (2004) ..................................................................................14

*Greater Yellowstone Coal. v. Servheen*,
  665 F.3d 1015 (9th Cir. 2011)........................................................25, 27–28

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir. 1992)....................................................................25

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002)..........................................................................14

*Ilio'ulaokalani Coal. v. Rumsfeld*,
    464 F.3d 1083 (9th Cir. 2006)........................................................................5

*Jachetta v. United States*,
    653 F.3d 898 (9th Cir. 2011)........................................................................13

*Kern v. BLM*,
    284 F.3d 1062 (9th Cir. 2002)....................................................................3, 4

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008)........................................................................17

*Lindberg v. U.S. Forest Serv.*,
    132 F. Supp. 3d 1255 (D. Or. 2015) ............................................................14

*Los Padres ForestWatch v. U.S. Forest Serv.*,
    25 F.4th 649 (9th Cir. 2022) ........................................................................17

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...........................................................7, 16, 19, 20, 24, 25

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
    545 F.3d 1147 (9th Cir. 2008)......................................................................14

*Nat'l Parks & Conservation Ass'n v. BLM*,
    606 F.3d 1058 (9th Cir. 2010)......................................................................15

*Native Ecosystems Council v. Tidwell*,
    599 F.3d 926 (9th Cir. 2010)............................................................19, 20, 23

*Novato Fire Prot. Dist. v. United States*,
    181 F.3d 1135 (9th Cir. 1999)......................................................................13

*Or. Nat. Desert Ass'n v. Jewell*,
    840 F.3d 562 (9th Cir. 2016)............................................................10, 12, 14

*Or. Nat. Desert Ass'n v. Rose*,
    921 F.3d 1185 (9th Cir. 2019)....................................2, 7, 9, 16, 21

*Or. Nat. Desert Ass'n v. Sabo*,
    854 F. Supp. 2d 889 (D. Or. 2012) ........................................15, 21

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
    426 F.3d 1082 (9th Cir. 2005) ...................................................24

*San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def.*,
    817 F.3d 653 (9th Cir. 2016) .......................................................7

*Save the Peaks Coal. v. U.S. Forest Serv.*,
    669 F.3d 1025 (9th Cir. 2012) .....................................................7

*S. Fork Band Council of W. Shoshone of Nev. V. U.S. Dep't of the Interior*,
    588 F.3d 718 (9th Cir. 2009)...................................................5, 10

*Thompson v. U.S. Dep't of Labor*,
    885 F.2d 551 (9th Cir. 1989) ...................................................8–9

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    878 F.3d 725 (9th Cir. 2017).......................................................26

*United States v. Pallares-Galan*,
    359 F.3d 1088 (9th Cir. 2004).....................................................13

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011)...............................................3, 7, 10

*Yee v. City of Escondido*,
    503 U.S. 519 (1992) ...........................................................12–13

## Regulations

40 C.F.R. § 1501.21 ...................................................................4

40 C.F.R. § 1502.1 .....................................................................7

40 C.F.R. § 1502.16 ................................................................3, 5

# INTRODUCTION

Federal Defendants admit that low water conditions pose a serious risk to Oregon spotted frogs in Jack Creek, particularly as temperatures rise and precipitation decreases during the summer grazing season. The Allotment Management Plan's (AMP) *nearly twenty-fold expansion* of grazing in Oregon spotted frog habitat threatens to make these precarious conditions much worse. Direct impacts to frogs from cattle trampling, harassing, and displacing them out of remaining pools will increase as pools shrink in size and number in the intermittent portion of Jack Creek. But the agencies largely brushed this important issue aside, and overlooked how climate change is poised to make low water conditions more frequent and more severe, which will exacerbate conflicts between cows and frogs. By failing to consider this key aspect of the problem, the agencies fell short of their duties under the National Environmental Policy (NEPA), the National Forest Management Act (NFMA), and the Endangered Species Act (ESA).

Faced with an administrative record that does not show it adequately considered this and other issues, the Forest Service grasps at straws by claiming that Plaintiffs waived these arguments. The agency is wrong. Plaintiffs and their members have invested in these issues for years and exhaustively provided their input. Instead of considering their concerns and adopting a balanced alternative that resolved conflicts while allowing grazing to continue on other pastures of the

Antelope Allotment, the Forest Service expanded grazing in the most controversial pastures for a rancher who has a long track record of violating permit conditions, agency orders, and a court injunction.

Yet the Federal Defendants irrationally assumed that the permittee would suddenly be successful at removing cattle as soon as low water conditions arise and preventing their return to Jack Creek. To cover up this substantial oversight, the agencies raise a host of irrelevant and misleading arguments that do not show where, in the record, they considered past management problems and the potential impacts if they recur.

By ignoring contradictory evidence and failing to provide rational explanations that support their conclusions, the challenged decisions fell short of bedrock Administrative Procedure Act (APA) requirements and are thus arbitrary, capricious, and unlawful. The Court should reject the Federal Defendants' *post hoc* rationalizations and vacate and remand the Environmental Impact Statement (EIS), Record of Decision (ROD), AMP, and 2018 Biological Opinion (BiOp).

## ARGUMENT

### I. THE EIS FAILED TO TAKE A HARD LOOK AT THE DIRECT IMPACTS OF GRAZING ON OREGON SPOTTED FROGS.

To take a "hard look" under NEPA, an EIS must include more than "general statements about 'possible' effects and 'some risk.'" *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019) (quoting *Blue Mountains Biodiversity Project*

*v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998)). An EIS must instead include a "discussion of environmental consequences" of a proposed action and its alternatives that is "reasonably thorough." *Kern v. BLM*, 284 F.3d 1062, 1071 (9th Cir. 2002)); 40 C.F.R. § 1502.16 (1978).[1] An EIS that inappropriately "downplays" impacts, makes unsupported assertions, and ignores an action's "combined and synergistic effects" is inconsistent with NEPA. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491–95 (9th Cir. 2011).

To fulfill this "hard look" duty here, the Forest Service needed to discuss the direct impacts of the proposed action and its alternatives on Oregon spotted frogs. Direct impacts to adult and juvenile frogs include mortality and injury from trampling and non-lethal impacts like displacement and disturbance, which worsen during low water conditions as cows and frogs congregate in shrinking pools. Opening Br. at 10, 25. Low water conditions in Jack Creek are already a serious threat, and climate change is poised to further dry up water flow during the summer due to higher temperatures, earlier snowmelt, and lower summer precipitation. 3-ER-0492–93; 4-ER-0897; 5-ER-1057. Even without additional harm from grazing and climate change, the Jack Creek population faces a serious risk of extinction given its "critically low numbers" and isolation. 2-ER-0203; 4-

---

[1] All cites to NEPA regulations are to the 1978 version. *See* Opening Br. at 24, n. 1.

ER-0898. Thus, the EIS needed to analyze the extent to which each alternative would directly kill, injure, or harm individual frogs and consider what that meant for the population. The EIS failed to do so, rendering it arbitrary and capricious.

## A. The EIS did not analyze the direct impacts of the alternatives on Oregon spotted frogs.

The Forest Service briefly argues that the EIS "discussed" potential direct impacts to frogs, but the cited portions of EIS largely provided general background information about the species and threats to it. Ans. Br. at 15 (citing 2-ER-0200–10). The EIS's direct and indirect effects analysis for the alternatives was short and labeled "Oregon Spotted Frog *Critical Habitat.*" 2-ER-0205–08 (emphasis added). That section merely "acknowledged" the potential for adverse impacts from trampling. Ans. Br. at 15. But it did not analyze the scope or severity of the direct impacts on frogs from cattle trampling, harassing, or displacing individuals out of aquatic habitat under each alternative. 2-ER-0205–08. The rest of the EIS's analysis for frogs focused on habitat concerns, not direct impacts. 2-ER-0208–10.

Even though the EIS is "where the Forest Service's defense of its position must be found," *Blackwood*, 161 F.3d at 1214, the agency tries to bolster its paltry analysis with five documents. Ans. Br. at 15–18. An EIS may incorporate such material by reference *if* it is cited and its content briefly described. 40 C.F.R. § 1501.21. But an agency is not "excused from its responsibility under NEPA" when it incorporates material that merely analyzes similar issues. *Kern*, 284 F.3d at

1073. Instead, the EIS and any incorporated material must analyze the impacts of *all alternatives*, and discuss "the specific environmental impacts at issue." *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009); 40 C.F.R. § 1502.16. Indeed, the alternatives analysis "is the heart of the [EIS]." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1095 (9th Cir. 2006) These five documents do not meet these requirements.

The agency first cites a draft Biological Assessment, but the EIS stated only that draft provided "additional detail" without briefly describing its content as required. 2-ER-0208. Regardless, that draft only considered the impacts of the proposed action, not the alternatives, and briefly acknowledged the *potential* for some direct effects like trampling but not others like harassment and displacement. 5-ER-0924, 5-0933–36. Indeed, FWS informed the Forest Service that the draft only "starts to hint at effects without connecting dots" and required more information "to fully understand the impacts" of grazing such as an estimate of potential frog mortality.[2] FER-0020, 0022. But the Forest Service failed to add such detail before finalizing the EIS. *Compare* Ans. Br. at 16 (citing 3-ER-0924, 5-ER-0933–36) *with* FER-0020-24 (nearly identical draft cited by EIS).

---

[2] FWS's comments illustrate the problem with relying on a *draft* biological assessment that was undergoing revision and awaiting FWS's final response under the ESA. *Cf.*, Ans. Br. at 21–22 (supporting reliance on this draft).

Next, the EIS cited to *A Conservation Assessment for the Oregon Spotted Frog* and *The Jack Creek OSF Site Management Plan* largely for background information and general recommendations. 2-ER-0200, 2-ER-0203, 2-ER-0206, 2-ER-0208. But those documents were issued years before the frog was listed under the ESA and the AMP was proposed, so they are outdated and merely disclosed the potential effects of grazing in general. *E.g.,* 3-SER-506 (claiming limited data about drought); 4-ER-0906 (lacking adequate data about impacts).

The Forest Service's reliance on a few pages from the EIS's Response to Comments is also misplaced. Ans. Br. at 17. Three of those pages referenced the Draft EIS's discussion of frogs, but the adequacy of that discussion is unknown because the public draft does not appear in the record. 1-SER-166, 1-SER-168–69; *see generally* FER-0003–19 (not listing the Draft EIS in the administrative record index). Furthermore, those pages mentioned the impacts of a "high intensity/low frequency" grazing system, 1-SER-166, which the AMP did not adopt. 3-ER-0331. The fourth page briefly rejected as speculative site-specific evidence of trampling in Jack Creek without providing more information about impacts. 1-SER-170.

The EIS cited the last document, the wildlife report, for additional background on general "stressors" without briefly describing its content. 2-ER-0202. Regardless, the agency cites short portions of the report that included

background or general issues and did not detail the direct impacts of the alternatives. *See* Ans. Br. at 18 (citing 4-ER-0694, 4-ER-0696, 4-ER-0707–09).

These documents individually and collectively did not provide a "full and fair discussion" of the impacts of the alternatives. *Kraayenbrink*, 632 F.3d at 495 (quoting 40 C.F.R. § 1502.1). Instead, they included general statements about possible risks that do not satisfy NEPA. *Rose*, 921 F.3d at 1191.

To support its position, the Forest Service relies on cases that are inapposite. Ans. Br. at 15. *San Diego Navy Broadway Complex Coalition v. U.S. Department of Defense*, 817 F.3d 653, 658, 661 (9th Cir. 2016), involved the "speculative, remote" chance of a terrorist attack at a Navy facility, unlike this case that involves the significant, direct threat that cattle will kill and harm frogs each year under the AMP. *Save the Peaks Coalition v. U.S. Forest Service*, 669 F.3d 1025, 1037 & n.5 (9th Cir. 2012), found that an agency's response to comments bolstered an EIS that discussed an issue "at length," whereas here, the EIS barely mentioned direct impacts in its effects analysis.

The Forest Service argues that additional detail would be speculative due to a lack of information about the effects of trampling. Ans. Br. at 19–20. But the EIS did not raise this point, making it an impermissible *post hoc* rationalization. *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("*State Farm*") (explaining that "courts may not accept ... *post hoc*

rationalizations"). Regardless, an internal draft illustrated that the new grazing scheme will be far worse for the frog than its alternatives, demonstrating that the agency was aware of additional detail that it could provide. 5-ER-0972–73. The agency's brief, unsurprisingly, tries to discredit this revealing comparison with a single, unsupported sentence. Ans. Br. at 23.

Trying a different tack, the Forest Service selectively and misleadingly cites post-FEIS documents, claiming that the BiOp supports its *post hoc* position that "more definitive information" was lacking. Ans. Br. at 20 (citing 3-ER-0415). To the contrary, the BiOp detailed direct impacts to frogs, estimated that grazing would kill or harm hundreds of individuals each year, and explained that non-lethal forms of harm like disturbance and displacement adversely affect frog fitness and population dynamics due to increased predation, energy expenditure, and a loss of foraging opportunities.[3] 3-ER-0414–16. FWS's 2015 Biological Opinion included similar information, FER-0025-31, which the Forest Service failed to consider. *See* FER-0003-19 (not including this document in the record); *Thompson v. U.S. Dep't*

---

[3] The agency ignored these significant forms of non-lethal harm and instead touts less relevant ones in its brief. *See* Ans. Br. at 20–21 (claiming the agency considered bedding down in riparian areas and exposure to pathogens).

*of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (explaining that the record includes *all* documents considered).

In sum, the EIS's failure to discuss or compare the direct impacts of the alternatives on Oregon spotted frogs rendered it arbitrary and unlawful. *Rose*, 921 F.3d at 1191; *Blackwood*, 161 F.3d at 1214.

### B. The EIS brushed aside the serious risks that low water and climate change pose to the Jack Creek population.

The EIS did not address climate change in its effects analysis for Oregon spotted frogs. 2-ER-0205–0208. Thus, the Forest Service's defense focuses on a few pages from two documents that were purportedly incorporated by reference. Ans. Br. at 26–28. But the cited pages of the *Jack Creek OSF Site Management Plan* mentioned climate change and grazing impacts in general. *Id*. at 27 (citing 4-ER-0891, 4-ER-0894–95, 4-ER-0897). The draft Biological Assessment likewise did not address the synergistic effects of climate change and grazing under all alternatives, and the cited pages provided only brief assertions about potential impacts. Ans. Br. at 28 (citing 1-SER-191; 5-ER-0933; 2-SER-256).

It is not enough for the Forest Service to disclose, in the EIS or a few documents scattered in the record, that low water conditions, drought, and climate change are among the "greatest" threats to Jack Creek and the frog. Ans. Br. at 19, 26–29. To take a "hard look" at this threat, the agency must analyze and disclose

*how* that threat will exacerbate the impacts of the alternatives. *Kraayenbrink*, 632 F.3d at 493 (an EIS must consider "combined and synergistic effects").

The EIS needed to consider how climate change will further reduce low water and remnant pools in Jack Creek during the ten-year life of the grazing permit, and explain what that meant for the frog under each of the alternatives. The Forest Service's argument that it could not do so due to uncertainty is a *post hoc* rationalization and ignores evidence that was available in the record. Ans. Br. at 30 (citing 2-ER-0308, which did not state uncertainty prevented an analysis of impacts on frogs); Opening Br. at 29 (describing available evidence).

The Forest Service pivots to the low water strategy, arguing that it will mitigate threats from low water conditions. Ans. Br. at 26, 28. But mitigation measures "are not a panacea for inadequate...analysis" in an EIS. *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570–71 (9th Cir. 2016). Rather, an EIS must discuss mitigation measures in enough detail to ensure their impacts are evaluated, and "[a]n essential component" of such a discussion is an analysis of the effectiveness of such measures. *S. Fork Band of Western Shoshone*, 588 F.3d at 727 (citation omitted). Here, the EIS did not consider how effective the low water strategy would be and instead assumed that it would minimize impacts despite evidence to the contrary. Opening Br. at 43, 56–58.

The Forest Service's failure to consider this important aspect of the problem was particularly egregious given the Jack Creek population's "critically low" numbers and serious extirpation risks due its small, isolated nature. 2-ER-0203; 3-ER-0489. The agency needed to consider that the added stressor of climate change could doom the population even before cattle kill or harm a significant number of frogs each year. 3-ER-0416; *see* 4-ER-0866–67 ("Drought is a significant driver toward local extirpation of the Jack Creek population without adding mortality from grazing.").[4] Indeed, these direct impacts and population-level issues are a more significant threat to the frog than impacts to habitat. *Cf.,* Ans. Br. at 33–34 (touting focus on habitat degradation); *see* 3-ER-0423, 3-ER-0429 (FWS finding significant direct impacts but no adverse effects to critical habitat).

Furthermore, the agency admits that small populations like this "are prone to wide fluctuations solely due to chance." Ans. Br. at 34. But this point merely underscores the risk that added mortality and harm during the permit's ten-year term could combine with a stochastic event to push this population to the point of no return. This also shows why a recent and fleeting bump in the population does not fundamentally change this population's critically low numbers. *Cf.*, Ans. Br. at

---

[4] The agency unreasonably dismisses Ms. Simpson's opinions. Ans. Br. at 28–29, She has substantial experience with the agency in this area and provides extensive site-specific evidence of cattle harming frogs and their habitat that the agency should have considered. 4-ER-0797–0804, 04-ER-0824–47, 4-ER-0860–62.

6. It is these specific vulnerabilities of the Jack Creek population, not a generic "methodology" or "analytic protocol," that drove the need for the EIS to analyze this issue. *Cf.*, Ans. Br. at 33 (citation omitted).

Finally, the agency touts a preliminary ruling in the prior case, Ans. Br. at 30–31, ignoring that the final decision found substantive legal violations that warranted enjoining grazing on the Chemult Pasture. *Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-CV-737-CL, 2016 WL 10637010, at *15 (D. Or. Sept. 12, 2016) ("CFOW").

For these reasons, the EIS paid short shrift to a "significant concern" about the direct impacts of the alternatives on Oregon spotted frogs in Jack Creek, which prevented the agency from fully and accurately disclosing the impacts of grazing to the public in violation of NEPA. *See Jewell,* 840 F.3d at 569–71.

## C.     Plaintiffs exhaustively raised their concerns to the agency.

To distract from the merits, the Forest Service argues that Plaintiffs may not cite new evidence or points in support of their "hard look" claim on appeal. Ans. Br. at 22–23, 32–33. To the contrary, Plaintiffs are free to "make any argument in support of their claim on appeal—they are 'not limited to the precise arguments they made below.'" *Allen v. Santa Clara Cnty. Corr. Peace Officers Ass'n*, 38 F.4th 68, 71 (9th Cir. 2022) (quoting *Yee v. City of Escondido*, 503 U.S. 519, 534

(1992)). "[I]t is claims that are deemed waived or forfeited, not arguments." *United States v. Pallares-Galan*, 359 F.3d 1088, 1094–95 (9th Cir. 2004).

Ignoring this precedent, the Forest Service relies on cases that involved new claims that were not waived or major issues developed in a motion for reconsideration or on reply. Ans. Br. at 22, 33 (citing *Alaska Airlines, Inc. v. United Airlines Inc*., 948 F.2d 536, 546 n.15 (9th Cir. 1991); *Novato Fire Prot. Dist. v. United States*, 181 F.3d 1135, 1141 n.6 (9th Cir. 1999); *Jachetta v. United States*, 653 F.3d 898, 906, 912 (9th Cir. 2011)). These cases are far afield from this one, in which Plaintiffs simply provided additional support for their existing claim that the EIS failed to take a hard look at the impacts of grazing on Oregon spotted frogs, which was framed broadly in the district court. 1-SER-076.

The Forest Service also contends that Plaintiffs forfeited their "hard look claim regarding the effects of climate change, drought, and grazing on the frog" by failing to raise this "issue" in objections during the predecisional review process. Ans. Br. at 24–26. This is wrong. Plaintiffs alerted the agency to their "hard look" claim regarding the EIS's inadequate analysis of the impacts of grazing on Oregon spotted frogs. 2-SER-337–38. This is the broad claim that Plaintiffs raised in the district court, 1-SER-76, and is at issue on appeal.

Plaintiffs' *argument* that the EIS failed to consider the combined effects of grazing and climate change is one way that the EIS failed to take a hard look.

Furthermore, Plaintiffs' objections incorporated their extensive comments, which raised climate change issues to which the agency responded. 2-SER-314; 2-SER-321; 2-SER-345–346; 4-ER-0841–42; 4-ER-0846; FER-0032–35. Plaintiffs did not need to use "magic words" about this issue "to leave the courtroom door open." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2002).

To support its defense, the Forest Service relies on unhelpful cases that involved different claims, not issues, raised in comments and in court. Ans. Br. at 25–26 (citing *Dep't of Transp. v. Pub Citizen*, 541 U.S. 752, 764 (2004); *North Id. Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008)). *Jewell* is also distinguishable because there, the plaintiff's NEPA claim involved a highly technical "genetic connectivity" issue that was not mentioned in comments to the agency, whereas here, the Forest Service complains about one argument that Plaintiffs made in support of a broad NEPA claim and raised in their comments. *Jewell*, 840 F.3d at 571–74.

The Forest Service also cites *Lindberg v. U.S. Forest Service*, 132 F. Supp. 3d 1255, 1268 (D. Or. 2015), but there the agency engaged with the plaintiff during the administrative process by attempting to resolve its objections through a meeting. *Id*. at 1261. In contrast, here, the Forest Service refused to meet and discuss Plaintiffs' objections and a potential resolution of this long-running dispute. *Compare* 2-SER-313, 2-SER-320, 2-SER-343 (requesting a meeting) *with*

2-SER-439–41 (resolving objections without a meeting). The agency also

neglected to consider much input from Plaintiffs, including complete copies of

their comments on the Draft EIS. *Compare* FER-0036 (describing comment

periods in 2010, 2012, 2014) and 2-SER-321, 2-SER-345–46 (Plaintiffs'

comments) *with* FER-0003-06 (excluding many comments from the record). Thus,

the agency did not provide "serious consideration" to Plaintiffs' input as the

district court expected. *Or. Nat. Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889, 900

(D. Or. 2012).

For these reasons, the Forest Service's attack on Plaintiffs' participation is

meritless. Accordingly, the Court should find that Plaintiffs' extensive involvement

adequately alerted the agency to their concerns. *Nat'l Parks & Conservation Ass'n*

*v. BLM*, 606 F.3d 1058, 1065–66 (9th Cir. 2010) (plaintiff need not articulate

"precise legal terms" to the agency).

## II.  POST-HOC RATIONALIZATIONS DO NOT SHOW THAT THE AMP WAS CONSISTENT WITH THE WINEMA FOREST PLAN.

The Forest Service focuses its NFMA defense on sweeping and generic

conclusions that the AMP complied with Forest Plan standards. But the agency did

not explain how the AMP's 20% alteration and soil compaction standards will

ensure compliance with the Forest Plan's 10% detrimental soil and 5% streambank

degradation standards. The agency also failed to show where, in the record, it

adequately accounted for the history of management problems on the allotment.

The Court cannot defer to this "void." *Rose*, 921 F.3d at 1191 (citation omitted).

## A. Riparian soil standards

Plaintiffs argued that the AMP's 20% use standards for indicators (alteration and compaction/post-holing/pedistalling) in fenced areas (which contain riparian soils and fens) and high priority fens are inconsistent with the Forest Plan's 10% detrimental soil standard. Opening Br. at 34–38; 3-ER-0620 (Forest Plan); 3-ER-0344–45 (AMP). The Forest Service responded with several defenses that fail.

First, the Forest Service claims that "20% alteration" "does not equate to 20% soil disturbance" without citing record support for this statement, Ans. Br. at 42, making it an impermissible *post hoc* rationalization. *State Farm*, 463 U.S. at 50; *see also* Ans. Br. at 40–41 (similarly arguing that the Forest Plan and AMP measure different things). This litigation position is inconsistent with the EIS and underlying reports, which interpreted soil alteration to include bare ground, compaction, pedestaling, 2-ER-0242 and 3-ER-0520–21, and identified such conditions as types of detrimental soil conditions. 3-ER-0583–84. Indeed, the Forest Plan explicitly includes compaction as an example of detrimental soil conditions. 3-ER-0620. Accordingly, the record shows that the AMP's alteration and compaction/post-holing/pedestaling indicators constitute detrimental soil conditions under the Forest Plan. Yet the agency never explained in the record how

a 20% standard for those indicators would ensure that no more than 10% detrimental soil conditions occur in riparian areas.

Second, the agency points to general conclusions in its soil specialist's report. Ans. Br. at 38–39, 42 (citing 3-ER-0595–97, 0602–03). But the five pages that the agency cites do not mention, let alone explain, how the AMP's 20% alteration and compaction standards are consistent with the Forest Plan's 10% detrimental soil standard. The agency's failure to "*explain the conclusions* it has drawn" about the AMP's consistency with the Forest Plan was arbitrary. *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008) (en banc) (emphasis added). Moreover, the agency cannot merely rely on "generic statements to support its conclusion in lieu of evidence that it has actually applied its substantive expertise." *Los Padres ForestWatch v. U.S. Forest Serv*., 25 F.4th 649, 657 (9th Cir. 2022) (quotation and citation omitted).

Third, the Forest Service pivots to the AMP's 10% standard for bare soil in "high priority" fens, Ans. Br. at 41, 43, but ignores Plaintiffs' point that this standard has limited application because "[t]he large majority of fens are not categorized as High-Value." Opening Br. at 35, n.9 (4-ER-0675). The agency does not identify where in the record it explained how this limited standard will ensure detrimental soil conditions remain below 10% across other riparian areas.

Next, the Forest Service claims that Forest Plan standards continue to apply and are not replaced by the AMP's 20% standards. Ans. Br. at 39–40. But this is irrelevant. Under the AMP, the Forest Service will monitor for compliance with the 20% standard in most riparian areas, and will only change management if the 20% standard is exceeded. 3-ER-0344–45. It failed to explain how that approach is consistent with the Forest Plan's requirement of having only 10% detrimental soil in riparian areas. The agency does not deserve deference for a position that deviates from the language of its Forest Plan. *See All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1113, 1116–17 (9th Cir. 2018).

Finally, the Forest Service brushes off as "speculative" but fails to dispute Plaintiffs' calculations that the 10% detrimental soil standard is roughly 50 to 100 acres away from being exceeded. Ans. Br. at 42–43; Opening Br. at 36–37. Despite the agency's conclusion that overall impacts should decrease, the Forest Service does not deny that its soil specialist predicted increasing impacts within the *thousands* of acres where grazing will be reintroduced. 4-ER-0650; 3-ER-0553–54, 0556–67. Increased impacts on just a fraction of those acres may soon exceed the Forest Plan's 10% standard given how quickly grazing (even at low levels) can damage riparian areas and how long recovery takes. 3-ER-0407; FER-0038 (continued exceedances of 10% bare soil threshold despite an injunction on grazing in 2016 and 2017); 5-ER-1053 (fen recovery from damage is "very unlikely").

Thus, the Forest Service's conclusion that the AMP was consistent with the Forest Plan's 10% detrimental soil standard is arbitrary and unworthy of deference because it is based on impermissible *post hoc* rationalizations and is contradicted by substantial evidence in the record. *State Farm*, 463 U.S. at 50; *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 935 (9th Cir. 2010).

**B. Streambank standard**

The Forest Service is wrong that the AMP's streambank provisions are consistent with the Forest Plan. Ans. Br. at 45. The agency argues that the Forest Plan's 5% degradation standard is measured over the long term while the AMP's 20% alteration standard is measured over the short term. Ans. Br. at 45. But this point, and the record, fail to explain how allowing 20% alteration year after year will ensure compliance with the 5% Forest Plan standard.

In the absence of record support, the agency advances a misleading interpretation of the AMP, claiming that if the 20% alteration standard is exceeded, the area will be rested. Ans. Br. at 45 (citing 3-ER-0345). But the AMP requires two years of exceedances, not just one, to trigger rest of the pasture for one season, and only excludes cattle to achieve desired conditions (presumably the 95% streambank stability standard) if four more years of exceedances occur. 3-ER-0345. This means that alteration may exceed 20% for six years before Jack Creek is allowed to recover to desired conditions. The agency claims that "streams can

repair some disturbance each year," but cites no record support, and does not

explain when or how a streambank may recover from 20% or more alteration to

meet the Forest Plan's 5% standard in the short or long term. Ans. Br. at 45.

The agency tries to bolster its position with documents that discuss general

streambank health but do not address the straightforward question at issue: whether

the AMP's 20% alteration standard is consistent with the Forest Plan's 5%

degradation standard. Ans. Br. at 46. Because the standards are at odds, the AMP is

arbitrary and inconsistent with the Forest Plan. *All. for the Wild Rockies*, 907 F.3d

at 1113, 1116–17.

### C. Trespass

By drastically underestimating the scope of trespass grazing in the past, the

Forest Service "failed to consider an important aspect of the problem" when it

determined that unauthorized use would be limited and its impacts insignificant.

*State Farm*, 463 U.S. at 43. The agency needed to accurately assess grazing under

the AMP to ensure consistency with the Forest Plan, which includes the viability

standard that the district court found enforceable in the prior case. *COFW*, 2016

WL 10637010, *8–9; *see also Tidwell*, 599 F.3d at 932, 936 (finding the Forest

Service violated a similar viability standard under NFMA); Opening Br. at 40

(citing viability standard and other discrete Plan mandates); *see* Ans. Br. at 49

(arguing that Plaintiffs failed to cite "enforceable" standards).

The Forest Service asserts that it adequately considered prior unauthorized use, but it relies on a survey that is not in the record. Ans. Br. at 51–52; *see generally* FER-0003-19 (failing to include the survey). This makes it impossible to evaluate the inconsistency between the survey's conclusions and evidence of substantially greater amounts of trespass in the record. Opening Br. at 11–13; 5-ER-1005–06, 5-ER-0995–0999 (documenting trespass in 2016–2017); *Sabo*, 854 F. Supp. 2d at 906; *CFOW,* 2016 WL 10637010, at *3. The Court cannot defer this void. *Rose*, 921 F.3d at 1191.

Contrary to the Forest Service's misleading suggestions, this issue is properly before the Court. Ans. Br. at 52. Plaintiffs have repeatedly raised their concerns about "chronic" trespass grazing and objected to the agency's inaccurate description and analysis of trespass in the challenged decisions. 2-SER-347–48; 2-SER-372–73; 2-SER-361–62; 2-SER-356; 2-SER-401, 2-SER-411. And in the prior case, the court expressly limited its decision to lift the injunction, which did not address whether the Forest Service's analysis of trespass supported its conclusion that the AMP was consistent with the Forest Plan. *Concerned Friends of the Winema v. U.S. Forest Serv*., No. 1:14-cv-00737-CL, 2018 WL 7254704, *3–4 (D. Or. Dec. 10, 2018), *adopted*, 2019 WL 982383 (D. Or. Feb. 28, 2019).

Given the substantial history of trespass, it was irrational for the agency to assume simply making legal what was previously illegal (grazing in Jack Creek

and North Sheep) will reduce unauthorized use. Ans. Br. at 52 (citing 2-ER-0080, 0091). The AMP required the permittee to follow a more complex and intensive management system by rotating cattle through additional pastures, keeping them out of rested pastures, and removing them early as soon as the AMP's standards are exceeded. 3-ER-0331–33, 3-ER-0345–47. There is no record evidence to show that chronic problems with keeping cattle behind fences, removing cattle when needed, and maintaining fences will suddenly stop under the new AMP.

Furthermore, the AMP did not, as the agency asserts, address "unauthorized" grazing through "restrictions to grazing that become more severe if problems recur." Ans. Br. at 48 (citing 3-ER-0345–46 (such consequences are for excessive use instead)). Moreover, the record does not show that the agency addressed contradictory evidence that similar mitigation consequences (increasing oversight, resting pastures, and excluding cattle) have been ineffective. Opening Br. at 11–13; *e.g.*, 5-ER-1005-06 (illustrating repeated trespass and weak responses). Thus, the Court should reject the agency's assurances that promises on paper will suddenly keep thirsty cattle out of Jack Creek and pastures when required.

Even if mitigation is just slightly less effective than the agency assumed, the agency needed to consider that the resulting grazing, even at low levels, can still have a significant impact. Opening Br. at 43–45. The agency irrationally ignores Plaintiffs' record evidence that light levels of grazing and trespass can have

harmful and significant impacts, Ans. Br. at 53, overlooking that most of it comes from current or retired federal scientists, including the agency's long-serving retired Wildlife Biologist for this area, FWS's BiOp, and the agency's own monitoring. Opening Br. at 43–45.

Overall, the Forest Service is wrong that it "reasonably" accommodated competing uses under NFMA. Ans. Br. at 46. It rejected a balanced alternative that proposed to protect public resources, eliminate conflicts, and allow grazing to continue. *See* 2-ER-0038 (alternative 4). Instead, the agency allowed the permittee to expand operations despite a record of noncompliance. Because the agency failed to supply rational explanations in the record and ignored evidence that contradicted its conclusions, it failed to show that the AMP was consistent with the Forest Plan as required. *Tidwell*, 599 F.3d at 926, 935.

## III. FWS ARBITRARILY IGNORED THAT CLIMATE CHANGE AND MITIGATION UNCERTANTIES WILL EXACERBATE IMPACTS DURING LOW WATER CONDITIONS.

FWS's BiOp overlooked evidence that climate change is poised to reduce water levels in Jack Creek during the summer and is "likely" one of the greatest threats to the "hydrological regime of Jack Creek." 4-ER-0897; 3-ER-0492–93; 5-ER-1057. Given the significance of this threat, the BiOp needed to analyze how climate change will exacerbate the effects of grazing, particularly during low water conditions, to accurately assess the effects of the action on Oregon spotted frogs as

required under the ESA. Because FWS cannot show that the BiOp did this, it resorts to *post hoc* rationalizations and doubles down on the low water management strategy despite a lack of record support. Thus, the BiOp "failed to consider an important aspect of the problem," rendering it arbitrary and capricious. *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094-95 (9th Cir. 2005) (quoting *State Farm*, 463 U.S. at 43).

## A. Climate change

FWS does not deny that the BiOp only mentioned climate change in two sentences.[5] Instead, the agency focuses on the BiOp's discussion of drought impacts.[6] Ans. Br. at 57. But this discussion did not address how climate change is poised to exacerbate low water from drought by further reducing streamflow in Jack Creek. *See* 3-ER-0492 (admitting that climate change is "likely" to result in "reduced late summer flow"). FWS argues that it "would have been speculative" to further evaluate the effects of climate change on the frog. Ans. Br. at 58. But the agency made this point in its brief, not in the BiOp, so the Court should reject it as an impermissible post-hoc rationalization. *State Farm*, 463 U.S. at 50.

---

[5] FWS's brief, like the BiOp, mentions briefly one study without explaining how it connects to the very different facts at issue here. Ans. Br. at 59–60.

[6] FWS continues to overlook the severity of past drought, Ans. Br. at 65–66, which occurred more often than the few years that the BiOp revealed. *See, e.g.*, 5-ER-1057 (noting evidence of drought in seven years between 2001–2009).

FWS's point fails anyway, since this Court has previously rejected the agency's refusal to consider the effects of climate change on listed species due to uncertainty. *Center for Biological Diversity v. Zinke*, 900 F.3d 1053, 1059, 1072–73 (9th Cir. 2018), faulted FWS for failing to analyze "the synergistic effects of climate change[] simply because of the uncertainty" given evidence that climate change was exacerbating threats to the species at issue. *Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011) ("GYC"), likewise found that FWS could not "simply invoke 'scientific uncertainty' to justify its action" but rather had to "rationally explain why the uncertainty" about climate change impacts supported its decision. "Otherwise, [the Court] might as well be deferring to a coin flip." *Id*.

Instead of learning its lesson from those cases, by simply explaining *within* the BiOp *why* uncertainty prevented further analysis, FWS claims that other, less applicable cases support its decision. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992), did not deal with climate change issues and the agency there provided a "reasonable evaluation of available data" and "supported its conclusions with ample data and analysis." *Turtle Island Restoration Network v. U.S. Department of Commerce*, 878 F.3d 725, 740 (9th Cir. 2017), involved a biological opinion that summarized the available climate change science and *explained why* uncertainties prevented further analysis. This is different than the

ESA decisions at issue in *Zinke*, *GYC*, and this case, which all failed to *explain why* uncertainty justified a lack of analysis.

FWS tries to brush aside *Zinke* and *Appalachian Voices v. U.S. Department of Interior*, 25 F.4th 259 (4th Cir. 2022), asserting that here, "there was simply a lack of scientific information specifically addressing the effects of climate change on the frog or its habitat," Ans. Br. at 63–64. FWS supports this *post hoc* rationalization by noting that the 2014 listing rule did not reach range-wide conclusions about climate change due to a lack of data "on an appropriate scale." Ans. Br. at 58 (citing 3-ER-0493). But the listing rule explained that a population's response to climate change depends on the "interplay" between frogs and their aquatic habitat, 3-ER-0493, and here, FWS had site-specific information about the "interplay" between frogs and Jack Creek to consider.

FWS was aware that climate change is one of the "greatest threats to the hydrological regime of Jack Creek" and is poised to "reduce the amount of water in the Jack Creek system in summer and fall." 4-ER-0897. FWS found that existing water quantity conditions in Jack Creek already may not meet the species' needs, 3-ER-0414, so it could and should have considered how further reductions in flows from climate change and grazing would affect frogs there. Lower flows in Jack Creek will increase conflicts between cattle and frogs at smaller and fewer remnant

pools. 3-ER-0415. This was all available and relevant scientific evidence that FWS could and should have considered.

Given that the BiOp estimated that grazing may harm or kill hundreds of individual frogs each year, 3-ER-0416, FWS needed to analyze how much additional harm the Jack Creek population can sustain as climate change worsens low water conditions. *See Appalachian Voices*, 25 F.4th at 277 (faulting FWS for failing "to account for the one thing we know about climate change: that it will get worse over time"). This population has hovered at critically low numbers for years and is particularly vulnerable to extinction, making it unclear how much more harm over the permit's ten-year term it can take. 3-ER-0395. Indeed, the population declined "dramatically" during an even shorter period of time when drought arose in the early 2000s. 3-ER-0472.

Finally, to the extent that there was uncertainty about precisely how much climate change would reduce water flow in Jack Creek, or what that meant for the species, FWS needed to heed the ESA's "policy of institutionalized caution." *GYC*, 665 F.3d at 1030 (citation omitted). By ignoring the synergistic effects of climate change and grazing, FWS failed to do so, rendering the BiOp arbitrary and capricious. *Zinke*, 900 F.3d at 1072–73; *Appalachian Voices*, 25 F.4th at 276–78.

## B. Mitigation measures

FWS's various defenses about mitigation miss Plaintiffs' key point about the low water adaptive management strategy: the BiOp underestimated the impacts that are likely even with successful implementation, which is far from certain.

FWS's conclusion that the "likelihood" of frog exposure to cattle during low water conditions would be "entirely eliminated" was based on the low water management strategy, 3-ER-0417, making its *post hoc* focus on other mitigation measures misplaced. Ans. Br. at 68–69. The agency tries to undermine this conclusion with other sentences in the BiOp that address issues beyond just the severe trampling threat during low water conditions. Ans. Br. at 73–74 (citing 3-ER-0416–18 (trampling risks in general, not just low water) and 3-ER-0414 (general risks from water quantity). Thus, the Court should reject the agency's litigation position that the BiOp did not really mean what it said.

Despite undercutting this conclusion, FWS's brief also doubles down on its underlying assumption, claiming that it is "elementary" that exclusion will prevent frogs from exposure to cattle. Ans. Br. at 73. But the agency cites no record support for its position and continues to ignore the days or weeks that may pass between the time that low water conditions arise and cattle are finally removed, which may cause substantial harm to frogs. Opening Br. at 56–59. It also overlooks that even the Forest Service recognized that initial efforts to exclude cattle from

Jack Creek may be unsuccessful. 3-ER-0385. FWS did not factor this potential

ineffectiveness into its analysis by considering for how long, and to what extent,

frogs may be subjected to cattle during low water conditions.

Instead of acknowledging these structural infirmities in the strategy, FWS

claims it was reasonable to assume the Forest Service would be diligent and

professional in implementing the strategy. Ans. Br. at 69–71. Again, this overlooks

that the strategy, even if perfectly implemented, will result in some exposure of

frogs to cattle during low water, which FWS did not consider. And it ignores that

the Forest Service does not have control over parts of the strategy, such as removal

of cattle from pastures—which falls on the permittee.

And the permittee has demonstrated time and time again that "permit action"

from the Forest Service does not ensure compliance with the grazing permit, even

after the Oregon spotted frog was listed under the ESA. Opening Br. at 11–13.

Indeed, the permittee continued to violate fencing requirements while the district

court was considering Plaintiffs' preliminary injunction motion. 5-ER-1153.

As for fencing, FWS again misses the point. Ans. Br. at 71–72. Plaintiffs'

position is not that fencing should be abandoned but, rather, that it was irrational

for FWS to assume fencing will "entirely" (or even substantially) eliminate the

likelihood of impacts by excluding cattle during low water. 3-ER-0417. Given the

importance of this issue, FWS needed to take a close look at the effectiveness of mitigation when evaluating the likely effects of the action on the frog.

In sum, the BiOp arbitrarily relied on the low water management strategy to protect cattle during low water conditions. Because exposure to cattle during low water is a significant threat to the frog, particularly during drought, FWS needed to fully consider these impacts in order to accurately assess grazing's effects. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 748 (9th Cir. 2020) (relying on indefinite mitigation measures was arbitrary and violated the ESA).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment and vacate the challenged decisions.

Date: May 26, 2023

Respectfully submitted,

/s/ Elizabeth H. Potter
Elizabeth H. Potter
Lauren M. Rule

**ADVOCATES FOR THE WEST**

*Attorneys for Plaintiffs-Appellants*
Western Watersheds Project et al.

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Certificate of Compliance for Briefs**

**9th Cir. Case Number 22-35706**

I am the attorney representing Plaintiff-Appellants.

**This brief contains 7000 words,** excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   /s/ Elizabeth H. Potter        **Date** May 26, 2023